LESLIE COHEN ESQ.
California Bar No. 93698
LESLIE COHEN LAW
506 Santa Monica Blvd., Suite 200
Santa Monica, CA 90401
Phone: (310) 394-5900
Facsimile: (310) 394-9280
Attorney for Perry and Rita Klein

DAVID J. WINTERTON ESQ.
Nevada Bar No. 004142
DAVID J. WINTERTON & ASSOCIATES LTD.
211 N. Buffalo Dr., Suite A
Las Vegas, Nevada 89145
Phone: (702) 363-0317
Facsimile:(702)363-1630
Co-counsel for Perry and Rita Klein
david@davidwinterton.com

## UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA
### LOS ANGELES DIVISION

| In re: | Case No. | 2:09-bk-43263-PC |
| | | 2:09-bk-43499-PC |
| SHALAN ENTERPRISES, LLC Substantially consolidated with Alan Rapoport, | Chapter 11 | |
| Debtor | DATE: December 8, 2010 TIME: 9:30 a.m. COURTROOM: 1539, 255 East Temple Street, Los Angeles, CA 90012 | |
| ☐ This pleading affect Shalan only ☐ This pleading affect Rapoport only ☒ This pleading affects both Shalan and Rapoport | | |

## REPLY MEMORANDUM IN SUPPORT OF MOTION TO ESTIMATE KLEINS' CLAIM FOR VOTING PURPOSES

COMES NOW creditors Klein, by and through their counsel of record, and hereby submit the following reply to Debtors response to Kleins' Motion to Estimate Kleins' Claim For Voting Purposes.

A.  **Rapoport Does Not Materially Dispute the Affirmed Portion of Kleins' Claim**

Rapoport does not dispute the affirmed portion of Klein's Claim, other than a disputed interest calculation.   The undisputed affirmed portion of the judgment, is a largely undisputed base of the estimation.  By Rapoport's calculations, he does not dispute $4,227,748.50 of Kleins claim.

1

B. **Rapoport Does Not Dispute the Methodology of Kleins Damage Calculations for Ouster and Abuse of Process**

Rapoport does not dispute that the manner or quantities of damages that Kleins cite for Abuse of Process or Ouster, including that Rapoport claimed the value of Kleins' rental was $15,000.00 a month. Exhibit F. Further, Rapoport does not dispute that Kleins non-economic damages could be three times economic damages, or that punitive damages could also be three times the compensatory damages.

C. **Evidentiary Support**

Kleins supported the motion with evidentiary support. Remarkably, the Debtors dispute the evidentiary basis, but provide no rational analysis why the appellate records is not evidence. In fact, Kleins have submitted detailed citations to the extensive trial record. The record is authenticated by the sworn declaration of one of the lawyers that represented Kleins in the trial and Nevada Supreme Court. These same citations to the records were not put at issue on appeal. Motion, at Exhibit A. The trial record is voluminous, which in written form, constitutes thousands of pages. Exhibit G.

Rule 3018(a) does not contemplate motions which requires claimant to present complete evidentiary support of a claim in the initial written motion. In re Zolner, 173 B.R. 629, 633 (Bankr. N.D. Ill. 1994)(a summary-type hearing is contemplated). The purpose of Rule 3018(a) is to allow a process of estimation. Id. An abbreviated evidentiary hearing can be held if facts are in dispute. Id. If made to do so, at an abbreviated evidentiary hearing, Kleins can submit the complete trial record for this court's review to substantiate the appellate record which has been submitted to the court.

The Nevada Supreme Court, however, remanded the case for a very narrow purposes which primarily include the allowance of the testimony of Judge Tony Abbatangelo, and to allow Klein to produce evidence of the partnership purpose of residing in 2 Rue Allard.

D. **The Value of 2 Rue Allard**

Rapoport asserts that Kleins "ridiculously allege the damage to 2 Rue Allard was in the amount of $500,000.00" and that the prayer for $500,000 is for punitive damages. Responsive Brief, at 5:5-6. In support, Rapoport attached the Complaint. Responsive Brief at Exhibit A.

In fact, the Complaint seeks "for compensatory damages, according to proof, but in the amount of not less than $500,000." Responsive Brief at Exhibit A-18: ln.3-4.

1  E.  **Mr. Rapoport's Declaration**

2      Mr. Rapoport's declaration is not supported by his own prior testimony, let alone the evidence that

3  the Nevada Supreme Court affirmed.  The Kleins substantial evidence cites to a written record.

4  Rapoport declaration, however, disputes very few of Kleins allegations.  Rapoport's declaration is also

5  largely false.  An quick look at the limited issues presented in the declaration reveal how shaky

6  Rapoport's claim are.

7      **Klein Owned 2 Rue Allard with Rapoport**

8      Rapoport takes the absolutely ridiculous position that he had "every right to evict the Kleins from 2

9  Rue Allard as Kleins were never owners of 2 Rue Allard."  Rapoport Declaration at ¶9.  Further,

10  Rapoport declares that he didn't put Klein on title to 2 Rue Allard because Klein "after the sale of the

11  property at 4 Rue Grimaldi,[1] Perry Klein was to put $250,000 in "seed money" into the partnership."

12  Rapoport Declaration at ¶8.  Rapoport also declares that Kleins had "no ownership interest" in 2 Rue

13  Allard.  Rapoport Declaration at ¶9.

14      Prior to Rapoport's attempts to evict Klein and take 2 Rue Allard for his own, Klein recorded a

15  conversation with Rapoport when they were standing in 2 Rue Allard.  Exhibit H (Declaration of Perry

16  Klein).  At trial, the jury heard Rapoport state the following through the recording.  Exhibit H.

17  MR. ALAN RAPOPORT:  Well, I just want to understand something.  Just - you're asking
   where's your protection.

18

19  MR. PERRY KLEIN:  Right.

20  MR. ALAN RAPOPORT:  Do we know we're partners?

21  MR. PERRY KLEIN:  Yes, we do.

22  MR. ALAN RAPOPORT:  How many other people know?

23  MR. PERRY KLEIN:  Probably a lot.

24  MR. ALAN RAPOPORT:  Would it be hard for you to prove your case?

25  MR. PERRY KLEIN:  No.

                                    ***

26

27  _____

28      [1]There never has been a property identified as 4 Rue Grimaldi at issue in the dispute between
   Klein and Rapoport. Exhibit H.  4 Rue Allard was a partnership property. Exhibit H.

1    MR. ALAN RAPOPORT:  Quote, unquote, do we own this house [2 Rue Allard] together?

2    MR. PERRY KLEIN:  Yes.

3    MR. ALAN RAPOPORT:  Quote, unquote, do we own the lot next door [4 Rue Allard]

4    together?

5    MR. PERRY KLEIN:  Yes.

6    Not unsurprisingly, the jury found that Rapoport breached the partnership agreement with Kleins when

7    he tried to take 2 Rue Allard.  Rapoport's declaration is remarkable only in that Rapoport continues to

8    misrepresent, to yet another court, that Perry Klein did not own 2 Rue Allard and 4 Rue Allard.

9    Importantly, this court need not decide whether Klein owned 2 Rue Allard as the Nevada Supreme Court

10    affirmed the jury's $2,857,800 decision that Rapoport breached the Klein/Rapoport partnership

11    agreement.  Motion at Exhibit B at 11.  Further, the jury already applied all offsets for Rapoport's causes

12    of action.[2]  Hence, the court affirmed decision establishes the existence of the partnership,  ownership of

13    the partnership property, and damages and offsets arising therefrom.

14    The majority of Rapoport's remaining issues asserted in his declaration are also false.   For the

15    reasons stated above, Rapoport cannot meaningfully claim that he alone owned 2 Rue Allard.  As the

16    evidence overwhelmingly supports that Klein owned 2 Rue Allard with Rapoport.

17    In light of the ownership of 2 Rue Allard, and Rapoport's own admission that Klein owned 2 Rue

18    Allard, the jury will not likely understand why (1) Rapoport attempted to summary evict Klein

19    describing him as a "squatter" in "his dwelling",[3] (2) Rapoport falsely affirmed to two separate courts

20    that Klein was invited guest in his home in separate TPO application,[4] and (3) in a District Court

21    unlawful detainer (eviction) action he declared "There never was any partnership between us."[5]

22    Rapoport will also have a difficult time explaining, why Rapoport, his co-defendant Scott Sibley,

23

24    ───────────────

25    [2]Motion at Exhibit E: 924 ($60,000.00)

26    [3]Attached, Exhibit I.

27    [4]Attached, Exhibit J and K.

28    [5]Attached, Exhibit L.

4

1    Abbatangelo's campaign manager Jason Huffer, and Judge Abbatangelo and his court had so many

2    phone calls to each other on the date the final TPO application was filed, through the date that

3    Abbatangelo ordered Kleins to be removed from 2 Rue Allard.  Exhibit M..

4    **6 Via Del Garda Was Not Partnership Property**

5        In an effort to rebut the fact that he wrongly filed a Lis Pendens against non-partnership property,

6    Rapoport now declares that 6 Via Del Garda was partnership property.  Rapoport Decl. at ¶11.  The

7    assertion is at odds to evidence for two reasons.  First, his claim that 6 Via Del Garda is partnership

8    property is at odds with his claim that no partnership existed.   More importantly, the trial court already

9    dealt with the issue.  Rapoport asserted in a counterclaim, that Rapoport's money was used to purchase

10   the property.  Exhibit N at 3 (unnumbered page) at ln. 12-13.  By motion, Klein presented the evidence

11   to the court of the monies used to purchase the property.  Exhibit N.  The court granted Kleins' motion

12   and allowed Klein to sell the property.  Exhibit O (6 Via Del Garda Order).  Moreover, Rapoport is now

13   judicially estopped from asserting the contrary.  The jury did not find in his favor on the counterclaim,

14   nor did he appeal the issue 6 Via Del Garda Order.

15   **Rapoport Paraded Naked In Front of Rita Klein**

16       Rapoport walked into the kitchen where Rita Klein was, complete naked, and told her to leave the

17   home.  Exhibit P, at 2016:203-04.

18   **Rapoport's TPO Application to the Las Vegas Justice Court Was Not Legitimate As
     Rapoport Had No Need for Protection in Las Vegas**

19
20       Rapoport attempted to legitimize his use of the Las Vegas Justice Court, rather than the Henderson

21   court, by claiming he had an office on Maryland Parkway in Las Vegas.  Exhibit Q at 1844:81.

22   Rapoport claimed to have "a back little office" where he used about 50 times, and used the phone and

     desk.  Id..  Carl Louden, the tenant of property since 1986, testified that the site had his 600 square foot
23
     office, and another building which was completely open, no drywall, no electrical, no lights.   Exhibit R
24
     at 1865 to 1866.  The homeless occupied the open property.  He did not share his office with Rapoport.
25
     Exhibit R at 1866:167 at 20-23.  He did not know Rapoport, or recognize him.  Id.
26
     **Rapoport Admitted He Held the Cue Balls In His Police Report**
27
         Rapoport attempted to threaten Kleins, while in 2 Rue Allard, with cue balls in his hand.  In his
28

5

1  statement to the police, Rapoport's admitted that he was the one holding the cue balls.   Exhibit J: 2837.

2  Klein did not threaten violence to Rapoport.  Exhibit H.

3  **Rapoport Realtor Testimony Established that Rapoport Had Kleins Papers After the Eviction**

4  Rapoport declaration claims that he had not taken their business papers.  However, Rapoport's

5  realtor testified at trial that, after the court ordered that Kleins could collect personal belongings from 2

6  Rue Allard, Rapoport asked him to be present when Kleins collected their belongings.   Exhibit S.

7  Rapoport showed the witness a CD that Kleins had $50,000.00.  Exhibit S at 1855:126.   Kleins were

8  upset because about their car and missing paperwork.  Exhibit S 1855:127 to 1856: 128.  When asked

9  about missing paperwork, Rapoport told his realtor "too bad for them, they were supposed to get a few

10  things and get out."  Exhibit S at 1856:127 at 2-3.

11  **The Trial Evidence Supports that Rapoport Hugged Judge Abbatangelo in 2 Rue Allard**

12  Rapoport's declaration asserts that he has never had "any personal relationship with Judge Tony

13  Abbatangelo."  Rapoport Decl. at ¶18.   The night after Kleins collected their personal belongings,

14  Rapoport's realtor also attended a party for Rapoport at 2 Rue Allard. Exhibit S at 1856:127 at 17-24.

15  He testified that Rapoport told him that he had spoken with the judge.  Exhibit S at 1856:128 at 9-14.

16  Finally, he testified that Judge Abbatangelo was at the party.  Exhibit S at 1856:129 at 16-17.  The judge

17  arrived walked over and hugged Mr. Rapoport.  Exhibit S at 1856:129 at 20-24.

18  F.    **Conclusion**

19  Much of the estimation is not in dispute. Rapoport does not meaningfully dispute $4,277,748.50 of

20  Kleins claim.  For the disputed portion, Kleins presented evidence to support an estimation of their claim

21  with direct citations to the appellate record.  The accuracy of these citations were not contested on

22  appeal.  In yet another version of the same events, Rapoport's responsive declaration is not believable.

23  Rapoport's own recorded testimony contradicts the declaration.  Rapoport's own conflicting declarations

24  and affidavits contradict the declaration.  Rapoport's realtor's testimony contradicts the declaration.  The

25  6 Via Del Garda evidence contradicts the declaration.  Wherefore, this court ought to estimate Kleins

26  ...

27  ...

28  ...

1  claim to be $7,556,417.98.

2      DATED this ___ day of ___ 2010

3

4  DAVID J. WINTERTON, ESQ.
   Nevada Bar No. 004142
5  DAVID J. WINTERTON & ASSOCIATES LTD.
   211 N. Buffalo Dr., Suite A
6  Las Vegas, Nevada 89145
   Phone: (702) 363-0317
7  Facsimile:(702)363-1630
   Co-counsel for Perry and Rita Klein
8  david@davidwinterton.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

**Exhibit G**

1  LESLIE COHEN ESQ.
   California Bar No.
2  LESLIE COHEN LAW
   506 Santa Monica Blvd., Suite 200
3  Santa Monica, CA 90401
   Phone: (310) 394-5900
4  Facsimile: (310) 394-9280
   Attorney for Perry and Rita Klein
5
   DAVID J. WINTERTON ESQ.
6  Nevada Bar No. 004142
   DAVID J. WINTERTON & ASSOCIATES LTD.
7  211 N. Buffalo Dr., Suite A
   Las Vegas, Nevada 89145
8  Phone: (702) 363-0317
   Facsimile:(702)363-1630
9  Co-counsel for Perry and Rita Klein
   david@davidwinterton.com
10
                    UNITED STATES BANKRUPTCY COURT
11                    CENTRAL DISTRICT OF CALIFORNIA
                        LOS ANGELES DIVISION
12
13  In re:                          | Case No.      2:09-bk-43263-SB
14     SHALAN ENTERPRISES, LLC       | Chapter 11
          Substantially consolidated with
15        Alan Rapoport,
16              Debtor
17     ☐ This pleading affect Shalan only
       ☐ This pleading affect Rapoport only
18     ☒ This pleading affects both Shalan
          and Rapoport
19
   **DECLARATION OF DAVID DOXEY IN SUPPORT OF REPLY MEMORANDUM IN**
20              **SUPPORT OF MOTION TO ESTIMATE CLAIM**

21  STATE OF NEVADA      }
                         } ss.
22  COUNTY OF CLARK      }

23      I affirm the following facts to be true, or upon information and belief, state them to be true under

24  penalty of perjury and under oath and affirmation, under the laws of the United States of America.

25  1.   I am an attorney licensed to practice in the State of Nevada.  I was one of Perry and Rita Kleins trial

26       and appellate lawyers in the Nevada State Trial Case no. A478057, in the Eighth Judicial District

27       Court, Clark County, State of Nevada, which trial was held in March and April of 2006.

28
                                    1

2.  The accuracy of the citations to the appellate record as set forth in the initial motion, were not put at issue in Rapoport's appeal.

3.  Exhibit I to this reply memorandum is a true and correct copy of a December 22, 2003 Summary Eviction Application which purports to be signed by Alan Rapoport.

4.  Exhibit J to this reply memorandum is a true and correct copy of what is commonly referred to as a TPO application, which was filed February 4, 2004 in the Henderson Township Justice Court.

5.  Exhibit K to this reply memorandum is a true and correct copy of what is commonly referred to as a TPO application, which was filed February 6, 2004 in the Las Vegas Township Justice Court.

6.  Exhibit L is a true and correct copy of a Declaration of Alan Rapoport filed in opposition to a Motion for Summary Judgment Concerning 4 Rue Allard, which purports to be executed on February 25, 2005.

7.  Exhibit M are true and correct copies of trial exhibits 165, 166, and 167 in the trial in Case no. A478057, in the Eighth Judicial District Court, Clark County, State of Nevada, which trial was held in March and April of 2006, which exhibits are summaries of the evidence of telephone calls between those identified in the exhibits.

8.  Exhibit N is a true and correct copy of a Motion to Remove Lis Pendens or in the alternative Motion to Sell Property, filed March 12, 2004 in A478057, in the Eighth Judicial District Court, Clark County, State of Nevada.

9.  Exhibit O is a true and correct copy of the order relative to the motion set forth in Exhibit N.

10.  Exhibit P is a true and correct copy of pages 2016 in the appellate record of A478057, in the Eighth Judicial District Court, Clark County, State of Nevada, which constitutes part of the testimony of Rita Klein during the trial.

11.  Exhibit Q is a true and correct copy of page 1844 in the appellate record of A478057, in the Eighth Judicial District Court, Clark County, State of Nevada, which constitutes part of the testimony of Alan Rapoport during the trial.

12.  Exhibit R is a true and correct copy of page 1865-67 in the appellate record of A478057, in the Eighth Judicial District Court, Clark County, State of Nevada, which constitutes the complete testimony of Carl Louden during the trial.

2

13. Exhibit S is a true and correct copy of page 1855-56 in the appellate record of A478057, in the

Eighth Judicial District Court, Clark County, State of Nevada, which constitutes part of the

testimony of Gene Northup during the trial.

DATED this _2 day of December, 2010

DAVID E. DOXEY

3

**Exhibit H**

1  LESLIE COHEN ESQ.
   California Bar No.
2  LESLIE COHEN LAW
   506 Santa Monica Blvd., Suite 200
3  Santa Monica, CA 90401
   Phone: (310) 394-5900
4  Facsimile: (310) 394-9280
   Attorney for Perry and Rita Klein
5
   DAVID J. WINTERTON ESQ.
6  Nevada Bar No. 004142
   DAVID J. WINTERTON & ASSOCIATES LTD.
7  211 N. Buffalo Dr., Suite A
   Las Vegas, Nevada 89145
8  Phone: (702) 363-0317
   Facsimile:(702)363-1630
9  Co-counsel for Perry and Rita Klein
   david@davidwinterton.com
10
                 **UNITED STATES BANKRUPTCY COURT**
11                  **CENTRAL DISTRICT OF CALIFORNIA**
                      **LOS ANGELES DIVISION**
12

| | |
|---|---|
| In re: | Case No.        2:09-bk-43263-SB |
| SHALAN ENTERPRISES, LLC<br>    Substantially consolidated with<br>    Alan Rapoport, | Chapter 11 |
| Debtor | |
| ☐ This pleading affect Shalan only<br>☐ This pleading affect Rapoport only<br>☒ This pleading affects both Shalan<br>    and Rapoport | |

19  <u>**DECLARATION OF PERRY KLEIN IN SUPPORT OF REPLY MEMORANDUM IN**</u>
20  <u>**SUPPORT OF MOTION TO ESTIMATE CLAIM**</u>

21  STATE OF NEVADA        }
                           } ss.
22  COUNTY OF CLARK        }

23      I affirm the following facts to be true, or upon information and belief, state them to be true under

24  penalty of perjury and under oath and affirmation, under the laws of the United States of America.

25  1.   I am one of the Plaintiff's in Case no. A478057, in the Eighth Judicial District Court, Clark County,

26       State of Nevada.

27  2.   Prior to Rapoport's attempts to evict my wife and I from 2 Rue Allard, I recorded a conversation

28

                                        1

1   with that I had with Rapoport when we were standing in 2 Rue Allard.

2   3.  At trial, the jury heard Rapoport state the following through the recording.

4   MR. ALAN RAPOPORT: Well, I just want to understand something. Just - you're asking where's your protection.

5   MR. PERRY KLEIN: Right.

6   MR. ALAN RAPOPORT: Do we know we're partners?

7   MR. PERRY KLEIN: Yes, we do.

8   MR. ALAN RAPOPORT: How many other people know?

9   MR. PERRY KLEIN: Probably a lot.

10  MR. ALAN RAPOPORT: Would it be hard for you to prove your case?

11  MR. PERRY KLEIN: No.

*** 

12  MR. ALAN RAPOPORT: Quote, unquote, do we own this house [2 Rue Allard] together?

13  MR. PERRY KLEIN: Yes.

14  MR. ALAN RAPOPORT: Quote, unquote, do we own the lot next door [4 Rue Allard] together?

16  MR. PERRY KLEIN: Yes.

17  4.  There never has been a property identified as 4 Rue Grimaldi at issue in the dispute between myself and Rapoport. 4 Rue Allard was a partnership property.

19  5.  During all relevant periods of my business relationship with Alan Rapoport, we were partners. The partnership 2 Rue Allard, and 4 Rule Allard.

21  6.  February 2, 2004, Rapoport came at me with cue balls to incite an incident. I did not threaten Rapoport with violence.

23  7.  Further affiant saith not.

24  DATED this ____ day of _____, 2010

27  Perry Klein, Declarant

2

**Exhibit I**

FROM : CONSTABLE           PHONE NO. : 7024597942        JUN. 01 2004 02:33PM

# CLARK COUNTY

| | |
|---|---|
| 2.40 | Fee |
| .10 | Mileag |
| .3 | Copy |
| .39 | TOTA |



### HENDERSON TOWNSHIP
## Constable's Office
### 243 WATER STREET • HENDERSON, NEVADA 89015

**EARL MITCHELL**
*Constable*

Telephone
(702) 455-7940
(702) 455-7942 - FAX

## DOCUMENT/NOTICE/MESNE
# APPLICATION

### TYPE OF APPLICATION REQUESTED . . . SELECT ONLY ONE

☐ 5 DAY VIOLATION OF LEASE.
☒ 5 DAY NOTICE TO PAY THE RENT OR QUIT THE PREMISES.
☐ 5 DAY UNLAWFUL DETAINER. *(This can only be obtained following the expiration of time of the above Notices. [Except 5 Day Pay or Quit.] Attach copy of previously served Notice.)*
☐ 30 DAY NOTICE TO QUIT THE PREMISES.
☐ 3 DAY NOTICE OF FORECLOSURE.
☐ 3 DAY PERFORMANCE NOTICE. *(This is served for violations of the rent or lease agreements and is NOT associated IN ANY WAY with non-payment of rent.)*

REASON: _____

☐ 45 DAY NOTICE.
☐ 10 DAY NOTICE. *(Usually associated with mobile home units.)*
☒ OTHER NOTICE: **SUMMARY EVICTION**

*ONLY MONIES EXCHANGING HANDS WAS CK FROM SQUATTER TO PAY FOR OCT/NOV EXP RELATED TO THEIR TR SQUATTER TO EUROPE*

### LANDLORD/OWNER INFORMATION

Business Name: _____
Last Name: **RAPOPORT**
First Name: **ALAN**
Address: **2 RUE ALLARD**
City: **HENDERSON** State: **NV** Zip: **89011**
Telephone Number: **805-501-5550**

### TENANT INFORMATION

Name: **PERRY + RITA KLEIN**
Address: **SAME AS ACROSS**
City: _____ State: _____ Zip: _____
Telephone Number: **702-592-8008**
Major Cross Street: _____

Additional Information: **FRIENDS STAYED IN HOUSE FOR 2 WKS IN SEPT BEFORE GOING TO EUROPE FROM 10/13 - 11/10/03 UPON RETURNING INSTEAD OF LEAVING THEY MOVED ALL THEIR CLOTHING INTO MY DWELLING AND REFUSE TO LEAVE**

### RENTAL INFORMATION

| | | |
|---|---|---|
| Tenancy Began | **8 / 15 / 03** | |
| Date Rent Due | **9 / 15 / 03** | |
| Monthly Rent | $ **5,000** | |
| Cleaning Deposit | $ **0** | N/A |
| Security Deposit | $ **0** | |
| Advanced Rent | $ **0** | |
| Rent Now Owed | $ **60,000** / 60,000 | |
| Late Fee | $ **3,600** / 3,600 | |

### WARNING

This form is NOT an Eviction Notice. It is NOT a Notice of any kind. It is ONLY to be used as an application by a landlord to obtain a Notice. If you the tenant, receive this form, THROW IT AWAY.

APPLICANT SIGNATURE: _____   DATE: **12/22/03**

PLEASE PRINT NAME: **ALAN RAPOPORT**

PLEASE CIRCLE ONE: Plaintiff Agent Owner

TELEPHONE NUMBER: **805-501-5550**

### ACCEPTANCE BY CONSTABLE

I have accepted this mesne to be served upon and mailed
to the tenant named in this action according to law this

**KLE000529**

_____ day of _____, 20_____

CONSTABLE'S OFFICE CLERK

2816

**Exhibit J**

## JUSTICE COURT, HENDERSON TOWNSHIP

### CLARK COUNTY, NEVADA

HENDERSON JUSTICE
COURT NLS

2004 FEB -4  A 8: 13

FILED

Alan Rapoport                          )
                                       )
         Applicant/Plaintiff,          )    Case No. 01B-04H7PO
                                       )
                                       )    IN THE MATTER OF THE APPLICATION FOR
   vs.                                 )    A TEMPORARY ORDER FOR PROTECTION
Perry Klein, ~~Rita Klein~~            )    AGAINST HARASSMENT, STALKING AND
         Adverse Party/Defendant.      )    AGGRAVATED STALKING
                                       )
                                       )

### AFFIDAVIT

**A Police Report must be filed prior to completing this Affidavit.**

Plaintiff states the following facts under the penalty of perjury:

1.    The Defendant has committed or threatened to commit harassment, stalking and/or

aggravated stalking against me.

2.    Name of Police Department and **report number** where a complaint of this crime has
been filed: _____ Henderson Police Department  20020202-435  M Johnston 634

3.    The acts occurred as follows: (Be specific, yet as brief as you can, as to the alleged acts)

Starting with the most recent incident, include the identity of all relevant parties, all important

dates, and locations, etc., how long it has gone on, and whether law enforcement or medical

personnel have been involved): __ Defendants are guests who were invited to visit my home

for ten days September 15, 2003. After 10 days defendants would not leave, and subsequently

through menace and threats of harm to myself, my family, and destruction to my home, drove

us from the home. I have started forcible detainer proceedings to remove defendants from my

home, which will be heard 2/9/04 in the District Court of Clark County. I returned to my home

2 Rue Allard Way, Henderson, on 2/2/04. At the time no other person was in the home.

### PLEASE DO NOT WRITE ON THE BACKS OF ANY PAGES

Rev. 10/03                          — 1 —

**KLE000578**

185
186
187
188
189
190
191
192
193

2834

**Additional Information (continued from Page 1):**

It was apparent from the interior of the home that defendants were still occupying my home

and using it as their own. I was on the telephone upstairs in what is my master bedroom

when defendants entered the home. Upon discovering my presence in the home, defendants

immediately disconnected the telephone system, and I ended up spending the night behind

the locked door of the room I was in, unable to contact anyone using the house phone.

Defendants left the next morning, and my wife and a friend arrived the next afternoon.

In the early evening of 2/3/04, defendants returned again to my home. Defendant Perry Klein

was obviously intoxicated. Defendant Perry Klein immediately accosted us in a loud, belligerent,

and agressive manner, and using foul and derrogatory language, attempted to instigate a fight

over possesion of my home.   My wife retreated to our bedroom and locked the door, my friend and

I retreated to the theater, holding cue balls in our hand in case Perry Klein attacked us, and

I called my attorney on a cell phone, who called the police to come to my house.

Upon hearing my telephone call, defendants went into the room they have been sleeping in,

locked themselves in the room, and when the police arrived, pretended nothing happened.

*[handwritten annotation in right margin: check / cell bill]*

*[handwritten annotation in right margin: good / follow / up]*

I, therefore, request that a Temporary Order for Protection be issued against the
Defendant so that the Defendant will be enjoined from threatening, physically injuring, or
harassing me, either directly or through an agent. I also request the Court prohibit the Defendant
from making any contact whatsoever with me or my family in any public or private places or by
telephone.

Rev. 10/03

*[handwritten text:]* AT 7:40 MR KLEIN BLOCKED MY
CAR AND AS I BORROWED MY FREINS CAR
TO GO TO COURT HE SLAMED INTO MY FREIENS
AR WITH HIS TRUCK TO STOP ME FROM LEAVING

- 2 -

KLE000579

*[right margin numbers:]* 185 186 187 188 189 190 191 192 193

4. I am requesting that the Defendant stay away from the following people:

| Name (Last) | (First) | (Middle) | minor child (Yes or No) | Race | Sex |
|---|---|---|---|---|---|
| Rapoport | Alan | | N | W | M |
| Rapoport | Shelly | | N | W | F |
| Rapoport | Ashley | | N | W | F |
| | | | | | |

5. I am requesting that the Court require the Defendant to stay away from the following places:
ADDRESSES LISTED BELOW ARE **NOT** CONFIDENTIAL. ANYTHING LISTED ON THIS FORM IS PUBLIC RECORD. CONFIDENTIAL INFORMATION MAY BE LISTED ON THE SEPARATE CONFIDENTIAL VICTIM INFORMATION WORKSHEET.

My Residence (Address):___2 Rue Allard Way, Henderon Nevada____ 89011

My School (Name):_____
Address: _____

My Place of Employment (Name):_____
Address: _____

Other Places (Name) _____
Address: _____

Under the penalty of perjury per NRS 53.045, I swear or affirm that the above information is true and that I am in need of the requested Temporary Order for Protection.

Dated:__2/4/2004_____    Plaintiff/Applicant's Signature:_____

KLE000580

Page 1 of 1.                                                  DR#_____

STATE OF NEVADA)
                )              SS: HENDERSON          DATE: 2/3/04
COUNTY OF CLARK)                                     TIME: 9:40 PM

I, ALAN RAPOPORT , date of birth 10/31/52 ,
Social Security Number 052 42 9693 , Residence Address 2 RUE ALLARD
HENDERSON NV , Occupation RETIRED
                                                    Res. 568-4077
Business Address_____ Phones Bus._____

do hereby make the following true statements to OFFLER JOHNSTON
of the Henderson Police Department, of my own free will. There have been no threats, or promises of immunity or reward made to me
to make this statement. It is further understood that this statement may be used either wholly or in part as evidence in a Court of Law.
I can read this and write the English language.

TONIGHT I WAS IN FEAR BECAUSE OF THREATS
MADE TO ME FROM PERRY KLEIN. HE THREATENED VIOLENCE
TO MY PERSONS, SO I CALLED THE POLICE TO
DE-ESCALATED THE SITUATION, PER MY ADVISE OF MY
JORNY. UPON HEARING MY PHONE CALL TO THE POLICE
PERRY KLEIN STOPPED DRINKING AND RETURNED TO THE
BEDROOM AND LOCKED THE DOOR AND HIS
THREATENING BEHAVIOR STOPPED UPON POLICE ARRIVAL
DURING THIS TIME MY WIFE WAS AFRAID TO LEAVE HER ROOM
BECAUSE SHE HEARD PERRY ATTEMPTING TO START A PHYSICAL
FIST FIGHT OVER HIS POSSESSION OF THE HOUSE. HE WAS
AGGRESSIVE, BELIGERANT AND LOUD SO I LOCKED MYSELF IN
A ROOM AWAITING THE POLICE ARRIVAL. I PICKED UP A
POOL BALL TO PROTECT MYSELF, BUT IT WAS NOT NEEDED.

_____              _____
Witnessing Officer                   Signature

HPD-155 Revised 3-1-91

18
1
1

2837

**Exhibit K**

02/06/04  FRI 14:10 FAX 775  589 6153        David K Winter Esq                    ☐002

FILED

Feb 6  3 21 PM '04

JUSTICE COURT
LAS VEGAS NEVADA
BY _____
DEPUTY

JUSTICE COURT, LAS VEGAS TOWNSHIP

CLARK COUNTY, NEVADA

1

2

3  Alan Rapoport                          )
                                          )
4          Plaintiff,                     )    IN THE MATTER OF THE APPLICATION FOR
                                          )    A TEMPORARY ORDER FOR PROTECTION
5                                         )    AGAINST HARASSMENT, STALKING AND
       vs.                                )    AGGRAVATED STALKING
6  Perry Klein                            )
                                          )    Case No. 04 PO 0147x               #3
7          Defendant                      )
                                          )        (To be completed by court staff)
8

9                          AFFIDAVIT

10  The above named Plaintiff, being first duly sworn, deposes and says:

11  The Defendant has committed or threatened to commit harassment, stalking and/or aggravated stalking against me.

12  Name of Police Department and report number where a complaint about this crime has been filed (if applicable)

13  1st - Henderson PD  20040202-435,  2nd DR #200404-485

14  The acts occurred as follows: (Be specific as to the alleged acts of the defendant, the identity of all relevant parties,

15  all important dates and locations, etc.)

16  Defendant was invited guest to my home.  Ultimately defendant refused to leave, leading

17  to filing of forcible detainer action. Defendant has keys to home from building my home.

18  On 2/2/04, I went to my home and was upstairs in my room on the telephone.

19  Defendant and defendant's wife entered my house, disconnected phone system.

20  On 2/3/04 While I and my wife and a friend were in home, Defendant and wife entered

21  my home, and tried to instigate fight. Defendant was drunk, belligerent, and

22  agressive. We retreated and called police. Defendant heard police call, retreated

23  to room he had been sleeping in, and when police arrived, pretended he had done

24  nothing. (Continued)

25

JC19 (Civil/Criminal Division) Rev 07/01            - 1 -

KLE000596

2850

DGL

David K Winter Esq     ☒003

Additional Information (continued from Page 1):

1 On 2/4/04, when trying to leave house, defendant ran out of house and blocked

2 my car with his truck, to prevent me from leaving house.

3 I got in friend's car, which defendant could not block, and defendant therafter rammed

4 my friend's car with me in it with his truck, trying to disable the car.  Car was not

5 disabled, and I drove to Henderson Police Department to report the incident.

6 Defendant followed me in his truck until he determined where I was headed, then drove off.

7 I fear for the safety of my family from defendant and his wife, who have now verbally

8 threatened us, attempted to insitgate physical violence, and now will drive cars into

9 vehicles we occupy to harrass and intimidate us to leaving our own home.

10
11
12
13
14
15
16
17
18
19
20
21
22    I, therefore, request that a Temporary Order for Pr otection be issued against the Defendant so that the Defendant

23 will be enjoined from threatening, physically injuring, or harassing me, either directly or through an agent. I also

24 request that the Court prohibit the Defendant from making any contact whatsoever with me or my family in any

25 public or private places or by telephone.

JC19 (Civil/Criminal Division) Rev 07/01          - 2 -

KLE000597

@004

02/06/04  FRI 14:11 FAX 775  589 6153       David K Winter Esq

1    I am requesting that the Court require the Defendant to stay away from the following places: (Check all that apply.)

2        [✓]   My Residence (Address): __2 Rue Allard Way, Henderson NV_____

3        [ ]   My School (Name and Address): _____

4

5        [✓]   My Place of Employment or Business 2750 S. Maryland Pkwy, Las Vegas NV_____

6

7        [✓]   Other Place(s) Frequented Regularly By Me as Follows (Specify): _____

8        10834 Palliser Bay Dr. Las Vegas, NV 89149   2750 MARYLAND PKWY  LV NV
                                                                          81D7
9    Under the penalty of perjury, I (Applicant) swear or affirm that the above information is true and that I am in need of

10   the requested Temporary Order for Protection.

11                                       Plaintiff/Applicant Signature_____

12

13   PLEASE COMPLETE SECTION 1 OR 2 BELOW:

14   (1) NOTARY:                          PLEASE STAMP BELOW:

15   Signed and Sworn to or Affirmed Before Me This

16   _____ day of _____, 20____

17   Notary Public_____

18

19   (2) UNSWORN DECLARATION: Per NRS 53.045

20   (a)   If executed in this state: "I declare under penalty of perjury that the foregoing is true and correct."

21         Executed on (date) _____   Signature_____

22   (b)   If executed outside this state: "I declare under penalty of perjury under the law of the State of Nevada

23         that the foregoing is true and correct."

24         Executed on (date) _____   Signature_____

25

JC19 (Civil/Criminal Division) Rev 07/01        - 3 -              **KLE000598**

2852

**Exhibit L**

5/26/05  THU 11:14 FAX 775 5896153

2-MAR-2005 11:43   DE :BIONDINI

3/25/05  FRI 13:19 FAX 775 5896153

0145621182          A:0017755896153    P.2/3
David K. Winter, Esq.    +++ Alan Rapoport

# DECLARATION OF ALAN RAPPORT IN SUPPORT OF MOTION

Alan Rapoport, under penalty of perjury, states:

1.   I am a defendant in this action. I have personal knowledge of the facts herein alleged, and if called to testify, would testify as follows:

2.   Perry Klein approached me to enter into a joint venture arrangement to develop properties for a profit. Two properties we were going to develop were 2 Rue Allard Way, and 4 Rue Allard Way, in Las Vegas, Nevada.

3.   I was to be the money, Perry Klein was to be the builder. The original agreement was that he would develop the properties, sell them at a profit, and then we would divide the proceeds after reimbursement of development costs.

4.   There was never any partnership between us.

5.   During the construction of a home on the lot located at 2 Rue Allard Way, Perry Klein had access to and controlled the monies used to develop 2 Rue Allard Way, as well as maintained the accounting records for the project.

6.   Request for the records has been made to Perry Klein, but he refuses to turn them over. I have limited knowledge concerning who the contractors were that were used to construct the house, and where the money went that went into the construction account, and there are defects that have become apparent in the construction discovered during my occupancy of the house.

//
//
//

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT CONCERNING 4 RUE ALLARD WAY    Page - 6 of 9

2904

26/05   THU 11:14 FAX 775 5896153   David K. Winter   Esq.

-MAR-2005 11:43   DE :BIONDINI           0145621182         A:0017755896153        P.3/3
  02/25/05  FRI 13:13 FAX 775 5896153    David K. Winter, Esq.      +++ Alan Napoport

7.   Upon information and belief, Perry Klein took monies from the construction account on 2 Rue Allard Way which made their way into his personal account.  I do personally know he took a $40,000 check from me for golf club membership, and thereafter purchased the membership in his own name, which I did not authorize, and received other monies which were not part of our original agreement.

8.   I know that Thomas Wall, the purchaser of 4 Rue Allard Way from Perry Klein, is a past business associate of Perry Klein.

9.   I have invested hundreds of thousands of dollars into 2 Rue Allard Way.  Perry Klein made no such similar investment.

10.   Certain representation were made to me to induce me to work with Perry Klein, one being that Perry Klein could build a house, and that could he market same so that it would be pre-sold before construction was finished. I subsequently learned Perry Klein hired a contractor to build the house at 2 Rue Allard Way, which was not with my consent and knowledge, Perry Klein had no marketing skills to pre-sell such a home, and in fact Perry Klein was a mortgage loan agent, which is not a person experienced in marketing real estate under construction.

Dated February 25, 2005.

Alan Rapoport

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT CONCERNING 4 RUE ALLARD WAY      Page - 8 of 9

2905

**Exhibit M**

# FEBRUARY 6, 2004 PHONE ACTIVITY--DATE OF TPO

| Phone Caller | Number Called | Recipient of Phone Call | Date | Time | Duration in Min. | Record |
|---|---|---|---|---|---|---|
| Huffer Cell Phone | (702)455-4124 | J. Abbatangelo Court | 2/6/2004 | 12:16 PM | 1 | Huffer Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 12:17 PM | 2 | Huffer Cell Phone |
| Huffer Cell Phone | (702)455-4124 | J. Abbatangelo Court | 2/6/2004 | 1:40 PM | 4 | Huffer Cell Phone |
| Huffer Cell Phone | (702)455-4124 | J. Abbatangelo Court | 2/6/2004 | 1:45 PM | 3 | Huffer Cell Phone |
| Huffer Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/6/2004 | 1:48 PM | 1 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/6/2004 | 1:52 PM | 1 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/6/2004 | 1:55 PM | 1 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/6/2004 | 1:56 PM | 1 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/6/2004 | 1:59 PM | 1 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)381-3881 | Judge Abbatangelo Pager | 2/6/2004 | 2:00 PM | 1 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/6/2004 | 2:04 PM | 1 | Sibley Cell Phone |
| **T.P.O. APPLICATION FAXED** | | | 2/6/2004 | 2:10 PM | | |
| Huffer Home Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 2:16 PM | 4 | Sibley Cell Phone |
| **T.P.O. ISSUED AGAINST RITA KLEIN** | | | 2/6/2004 | 2:58 PM | | |
| **T.P.O. APPLICATION FILED AGAINST PERRY KLEIN** | | | | 3:21 PM | | |
| **T.P.O. APPLICATION AGAINST PERRY KLEIN** | | | | 3:22 PM | | |
| Rapoport Cell Phone | (702)382-2747 | Scott Sibley Office | 2/6/2004 | 3:30 PM | 2 | Rapoport Cell Phone |
| **T.P.O. ISSUED AGAINST PERRY KLEIN** | | | | 3:31 PM | | |
| Rapoport Cell Phone | (702)382-2747 | Scott Sibley Office | 2/6/2004 | 3:32 PM | 2 | Rapoport Cell Phone |
| Rapoport Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 3:34 PM | 11 | Rapoport Cell Phone |
| Scott Sibley Cell Phone | (805)501-5550 | Rapoport Cell Phone | 2/6/2004 | 3:35 PM | 7 | Sibley Cell Phone |
| Clark County Clerk's Offi | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 4:05 PM | 1 | Huffer Cell Phone |
| Huffer Cell Phone | (702)381-3881 | Judge Abbatangelo Pager | 2/6/2004 | 4:23 PM | 1 | Huffer Cell Phone |
| Huffer Cell Phone | (702)381-3881 | Judge Abbatangelo Pager | 2/6/2004 | 4:50 PM | 3 | Huffer Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 4:51 PM | 1 | Sibley Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 4:58 PM | 3 | Huffer Cell Phone |
| Huffer Cell Phone | (702)382-274/ | Scott Sibley Office | 2/6/2004 | 4:59 PM | 1 | Huffer Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 5:02 PM | 2 | Huffer Cell Phone |
| 2 Rue Allard Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 5:05 PM | 2 | Sibley Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 5:06 PM | 2 | Sibley Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 5:07 PM | 2 | Huffer Cell Phone |
| Huffer Cell Phone | (702)604-9307 | Judge Abbatangelo Cell | 2/6/2004 | 5:11 PM | 1 | Sibley Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 5:16 PM | 1 | Huffer Cell Phone |
| Rapoport Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 5:27 PM | 1 | Sibley Cell Phone |
| Rapoport Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 5:38 PM | 1 | Sibley Cell Phone |
| Rapoport Cell Phone | (702)604-9307 | Judge Abbatangelo Cell | 2/6/2004 | 5:39 PM | 1 | Huffer Cell Phone |
| Huffer Cell Phone | (805)501-5550 | Rapoport Cell Phone | 2/6/2004 | 5:40 PM | 1 | Sibley Cell Phone |
| ...t Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 5:59 PM | 6 | Sibley Prior |

2930



PLAINTIFF'S
EXHIBIT
A4.057

| | | | | | | |
|---|---|---|---|---|---|---|
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 6:12 PM | 4 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)604-9307 | Judge Abbatangelo Cell | 2/6/2004 | 6:17 PM | 2 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)604-9307 | Judge Abbatangelo Cell | 2/6/2004 | 6:18 PM | 5 | Sibley Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 6:21 PM | 2 | Huffer Cell Phone |
| Huffer Cell Phone | (702)604-9307 | Judge Abbatangelo Cell | 2/6/2004 | 6:28 PM | 1 | Huffer Cell Phone |
| Judge Abbatangelo Cell | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 6:28 PM | 2 | Sibley Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 6:29 PM | 2 | Huffer Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 6:32 PM | 2 | Huffer Cell Phone |
| Huffer Cell Phone | (702)604-9307 | Judge Abbatangelo Cell | 2/6/2004 | 6:34 PM | 2 | Huffer Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 6:37 PM | 2 | Huffer Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 6:47 PM | 2 | Huffer Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 7:18 PM | 2 | Huffer Cell Phone |
| Scott Sibley Cell Phone | (702)604-9307 | Judge Abbatangelo Cell | 2/6/2004 | 7:28 PM | 1 | Scott Sibley Cell |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 7:37 PM | 1 | Huffer Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/6/2004 | 8:01 PM | 1 | Sibley Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 8:11 PM | 3 | Sibley Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 8:59 PM | 1 | Huffer Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/6/2004 | 9:44 PM | 1 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/6/2004 | 9:44 PM | 1 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/6/2004 | 9:45 PM | 3 | Sibley Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 9:50 PM | 10 | Sibley Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/6/2004 | 10:44 PM | 5 | Sibley Cell Phone |

# FEBRUARY 10, 2004 PHONE ACTIVITY--HEARING

| Phone Caller | Number Called | Recipient of Phone Call | Date | Time | Duration In Min. | Record |
|---|---|---|---|---|---|---|
| Huffer Home Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/10/2004 | 8:04 AM | 4 | Sibley Cell Phone |
|  |  | Blocked NBR to Sibley Cell Phone | 2/10/2004 | 8:29 AM | 2 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/10/2004 | 8:43 AM | 1 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)873-8623 | Huffer Home Phone | 2/10/2004 | 8:43 AM | 2 | Sibley Cell Phone |
| Huffer Home Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/10/2004 | 8:47 AM | 1 | Huffer Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/10/2004 | 8:48 AM | 1 | Sibley Cell Phone |
| Huffer Cell Phone | (702)455-4124 | J. Abbatangelo Court | 2/10/2004 | 8:52 AM | 1 | Huffer Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/10/2004 | 8:53 AM | 6 | Sibley Cell Phone |
| **T.P.O. HEARING STARTS** |  |  |  | **9:57 AM** |  |  |
| Scott Sibley Cell Phone | (702)455-4400 | Clark County Clerk's Office | 2/10/2004 | 10:39 AM | 5 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/10/2004 | 10:52 AM | 1 | Sibley Cell Phone |
| Huffer Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/10/2004 | 11:24 AM | 1 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/10/2004 | 11:54 AM | 8 | Sibley Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/10/2004 | 12:31 PM | 1 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/10/2004 | 12:45 PM | 1 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Scott Sibley Cell Phone | 2/10/2004 | 12:50 PM | 1 | Huffer Cell Phone |
| Huffer Cell Phone | (702)381-3881 | Judge Abbatangelo Pager | 2/10/2004 | 1:11 PM | 2 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/10/2004 | 1:16 PM | 4 | Huffer Cell Phone |
| Huffer Cell Phone | (702)455-4124 | J. Abbatangelo Court | 2/10/2004 | 1:43 PM | 2 | Sibley Cell Phone |
| Huffer Home Phone | (702)528-9588 | Scott Sibley Cell Phone | 2/10/2004 | 2:27 PM | 6 | Sibley Cell Phone |
| Huffer Cell Phone | (702)382-2747 | Scott Sibley Office | 2/10/2004 | 3:04 PM | 4 | Huffer Cell Phone |
| Huffer Cell Phone | (702)455-4124 | J. Abbatangelo Court | 2/10/2004 | 3:39 PM | 1 | Huffer Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/10/2004 | 3:58 PM | 1 | Huffer Cell Phone |
| Huffer Cell Phone | (702)381-3881 | Judge Abbatangelo Pager | 2/10/2004 | 4:48 PM | 1 | Huffer Cell Phone |
| Rapport Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/10/2004 | 5:12 PM | 2 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/10/2004 | 5:20 PM | 4 | Sibley Cell Phone |
| 2 Rue Allard Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/10/2004 | 5:24 PM | 14 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)568-4077 | 2 Rue Allard Phone | 2/10/2004 | 5:42 PM | 12 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/10/2004 | 6:58 PM | 1 | Sibley Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/10/2004 | 7:31 PM | 2 | Huffer Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/10/2004 | 8:06 PM | 1 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/10/2004 | 8:07 PM | 1 | Sibley Cell Phone |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/10/2004 | 8:07 PM | 2 | Sibley Cell Phone |
| Huffer Home Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/10/2004 | 10:24 PM | 19 | Sibley Cell Phone |

Case No: A478057
MARKED FOR IDENTIFICATION
PLAINTIFF'S PROPOSED EXHIBIT 166

PLAINTIFF'S EXHIBIT
166
90-1-3
A478057
PENGAD-Bayonne, N.J.

# FEBRUARY 11, 2004 PHONE ACTIVITY--PARTY

| Phone Caller | Number Called | Recepient of Phone Call | Date | Time | Duration in Min. | Record |
|---|---|---|---|---|---|---|
| Huffer Home Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/11/2004 | 7:22 AM | 6 | Scott Sibley Cell |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/11/2004 | 10:07 AM | 2 | Scott Sibley Cell |
| Huffer Cell Phone | (702)382-2747 | Scott Sibley Office | 2/11/2004 | 10:29 AM | 2 | Scott Sibley Cell |
| Huffer Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/11/2004 | 10:45 AM | 4 | Scott Sibley Cell |
| Scott Sibley Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/11/2004 | 1:45 PM | 6 | Scott Sibley Cell |
| Huffer Home Phone | (702)604-9307 | Judge Abbatangelo Cell | 2/11/2004 | 2:44 PM | 8 | Huffer Cell Phone |
| Huffer Cell Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/11/2004 | 4:48 PM | 6 | Scott Sibley Cell |
| Huffer Home Phone | (805)501-5550 | Rapport Cell Phone | 2/11/2004 | 6:07 PM | 2 | Huffer Home |
| 2-Rue Allard Phone | (702)353-3397 | Scott Sibley Cell Phone | 2/11/2004 | 6:38 PM | 2 | Scott Sibley Cell |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/11/2004 | 7:58 PM | 1 | Scott Sibley Cell |
| Scott Sibley Cell Phone | (702)528-9588 | Huffer Cell Phone | 2/11/2004 | 8:25 PM | 2 | Scott Sibley Cell |
| Scott Sibley Cell Phone | (702)382-3881 | Judge Abbatangelo Pager | 2/11/2004 | 9:16 PM | 1 | Scott Sibley Cell |
| Scott Sibley Cell Phone | | Blocked NBR to Sibley Cell Phone | 2/11/2004 | 9:18 PM | 9 | Scott Sibley Cell |



PLAINTIFF'S
EXHIBIT
167
A478057

Case No: A478057
MARKED FOR IDENTIFICATION
PLAINTIFF'S PROPOSED EXHIBIT
167

2933

**Exhibit N**

1  DAVID J. WINTERTON, ESQ.
   Nevada Bar No. 004142
2  DAVID E. DOXEY, ESQ.
   Nevada Bar No. 008429
3  DAVID J. WINTERTON & ASSOCIATES, LTD.
   211 No. Buffalo Drive, Suite A
4  Las Vegas, Nevada 89145
   (702) 363-0317
5
   Attorneys for Plaintiff,
6  Perry Klein

*FILED*

*MAR 12  12 09 PM '04*

*Shirley D. Parraguirre*
*CLERK*

7                    **DISTRICT COURT**

8              **CLARK COUNTY, NEVADA**

9
   PERRY KLEIN, an individual,              )
10                                           )
                   Plaintiff,               )
11                                           )    Case No.:   A 478057
   vs.                                       )    Dept. No.:  XIII
12                                           )
   ALAN RAPOPORT, an individual and          )
13 and DOES I through X, inclusive, and      )
   ROE CORPORATIONS I through X,             )
14 inclusive                                 )    **Date:**
                                             )    **Time:**
15                 Defendants.               )
                                             )    [Arbitration Exempt]
16
17            <u>**MOTION TO REMOVE LIS PENDENS**</u>

18     <u>**OR IN THE ALTERNATIVE MOTION TO SELL PROPERTY.**</u>

19        COMES NOW, PERRY KLEIN, Plaintiff by and through his counsel David J. Winterton

20 & Associates Ltd., hereby files this Motion to Sell Real Property. This Motion is based upon the

   pleadings and papers on file, the attached memorandum of points and authorities and any oral
21
   argument requested.
22
   Dated this day *12* of March, 2004.
23
24                          DAVID J. WINTERTON & ASSOCIATES

25
                     By: _____
26
                          David J. Winterton Esq.
27                        Nevada Bar No.: 004142
                          211 North Buffalo Drives, Suite A
28                        Las Vegas, Nevada 89145

## NOTICE OF MOTION

TO:    ALL INTERESTED PARTIES AND THEIR COUNSEL OF RECORD

YOU, AND EACH OF YOU, WILL PLEASE TAKE NOTICE that the undersigned will bring the foregoing Motion to Sell Property on for hearing before the above entitled court on the ___ day of *March*, 2004, at the hour of ___ o'clock, or as soon thereafter as counsel can be heard.

DATED this ___ day of March, 2004.

DAVID J. WINTERTON & ASSOCIATES, LTD.

By: _____
    DAVID J. WINTERTON, ESQ.
    Nevada Bar No. 004142
    211 North Buffalo Drive, Suite A
    Las Vegas, Nevada 89145

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    STATEMENT OF FACTS

COMES NOW, PERRY KLEIN, by and through his counsel David J. Winterton & Associates Ltd., hereby files this memorandum of points and authorities in support of its motion to Remove lis Pendens.

### I.

### STATEMENT OF FACTS

1.    The Defendant has filed a lis pendens on a certain piece of property located at 6 Del Garda, Henderson Nevada 89011.

2.    This has nothing to do with the partnership as alleged by Rapoport.

3.    The Property was acquired by Mr. Klein. See escrow instructions in Exhibit 1. There was a deposit in the amount of $15,000.00. The balance of $140,141.83 came from a loan. The loan was from a home equity loan with Mr. Klein from Prudential.

4.    There is a check from Mr. Klein in the amount of $15,000.00. See Exhibit 2.

5.    There is a check that the funds came from the sale of the residence of 20 Rue Grimaldi Way, Henderson Nevada which is Mr. Klein's old residence which is part of the down

1    payment. See Exhibit 3.  The sale of the residence was deposited into three accounts.

2    See Exhibit 4.  One was deposited into the Bank of the West. See Exhibits 5 and 6.

3    6.    The Bank of the West then executed a cashier's check. Those funds were used to pay for

4    the payment of 6 Via Del Garda, Henderson, Nevada 89011.

5    7.    Also attached is a copy of the loan for the balance of the loan on the property. Klein

6    wants the property sold, the loan paid off and his proceeds returned. See Exhibit 7.

7    8.    A copy of the proposed sale offer is attached as Exhibit 8.

8                                      **II.**

9                              **LEGAL ANALYSIS**

10    1. The Property is not part of any partnership and the lis pendens on the Property should be

11    removed.

12          In the Counter-Claim, the Defendant states:

13          That it was Rapoport money used to purchase the property.

14          The Plaintiff has a Buyer for a certain piece of Property known as 6 Del Via Garda.  It is

15    feared that if we wait too long the Buyer will walk away.  Time is of the essence to close the

16    deal.  The Buyer has arranged for financing and costs and interest are running.  If it does not

17    close soon the Buyer will walk.  It is important that the Property be allowed to be sold as soon as

18    possible.  The Property is being sold at an arm's length transaction.  It is for more than it was

19    purchased for by Klein.  It is for fair market value.  The Property is in Klein's name and there is

20    no evidence that any funds from Rapoport were used to purchase the Property as alleged in the

21    courter-claim.  The lis pendens should be removed.

22    **2.  Even if there is a partnership, the Property should be sold.**

23          Under Chapter 39, it states:

24    **NRS 39.010  Actions for partition of real property; partial partition.**
          NRS 39.010  Actions for partition of real property; partial partition.
25    **When several persons hold and are in possession of real property as joint**
      **tenants or as tenants in common,** in which one or more of them have an estate
26    of inheritance, or for life or lives, or for years, **an action may be brought by one**
      **or more of such persons for a partial partition thereof according to the**
27    **respective rights of the persons interested therein, and for a sale of such**
      **property** or a part of it, if a partition cannot be made without great prejudice to
28    the owners or if the owners consent to a sale. Whenever from any cause it is, in

the opinion of the court, impracticable or highly inconvenient to make a complete partition, in the first instance, among all the parties in interest, the court may first ascertain and determine the shares or interest respectively held by the original cotenants, and thereupon cause a partition to be made, as if the original cotenants were the only parties to the action and thereafter may proceed to adjudge and make partition separately of each share or portion so ascertained and allotted as between those claiming under the original tenant to whom the property has been set apart, or may allow them to remain tenants in common thereof, as they may desire.

[1911 CPA § 585; RL § 5527; NCL § 9074]---(NRS A 1985, 771)

Partition is absolute right of tenant in common; partition not necessarily founded on misconduct. Tenant in common may insist upon partition as absolute right. Partition is not necessarily founded on any misconduct on the part of cotenants and will be decreed so as to do the least possible injury to several owners. Dall v. Confidence Silver Mining Co., 3 Nev. 531 (1868), cited, Kent v. Kent, 108 Nev. 398, at 402, 835 P.2d 8 (1992)

Partitioning land with improvements. In carrying out an order to partition land into two parcels, if land cannot be divided into parcels of convenient shape without throwing all improvements into one parcel, the parcel which does not contain improvements should be increased in area until its value is equal to that of the parcel containing the improvements. Dondero v. Vansickle, 11 Nev. 389 (1876)

Division according to value. Where land is partitioned under secs. 277 to 280, inclusive, ch. 112, Stats. 1869 (cf. NRS 39.120 et seq.), the land must be divided into parcels of equal value, and not necessarily of equal size. Dondero v. Vansickle, 11 Nev. 389 (1876)

Sale in lieu of partition. In an action for partition of real property consisting of a single city lot with a house covering most of the lot, the court was justified in decreeing that the property be sold, under NCL § 9074 (cf. NRS 39.010), providing for sale of such property or part of it if it appears that the partition cannot be made without great prejudice to the owners. Wolford v. Wolford, 65 Nev. 710, 200 P.2d 988 (1948)

Fundamental goal in partitioning real property. Fundamental goal of court in partitioning real property is to divide the property so as to be fair and equitable and to confer no unfair advantage on any of cotenants. (See NRS 39.010.) Kent v. Kent, 108 Nev. 398, 835 P.2d 8 (1992)

# III.

## CONCLUSION

Based on the foregoing Plaintiff request this Court to enter an order to 1) remove the lis pendens or in the alternative; 2) order the sale of the property.

Dated this ___ day of March, 2004.

DAVID J. WINTERTON & ASSOCIATES LTD.

By: _____
David J. Winterton Esq.
Nevada Bar No.; 004142
211 North Buffalo Drive, Suite A
Las Vegas, Nevada 89145

1

## CERTIFICATE OF SERVICE

2      I hereby certify that I am an employee of David J. Winterton & Assoc., Ltd., and that on the

3  11 day of March, 2004, I caused to be faxed and deposited in the United States mail, via first class,

4  postage prepaid, at Las Vegas, Nevada a true and correct copy of a MOTION TO REMOVE LIS

5  PENDENS OR IN THE ALTERNATIVE MOTION TO SELL REAL PROPERTY, addressed as

6  follows:

7

   David K. Winter, Esq.
8  P.O. Box 12397
   Zephyr Cove, Nevada 89448-4397
9  Fax: 775-589-6153

10  _____

    Employee of David J. Winterton & Assoc. Ltd.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT "1"

Settlement Statement

# First American Title Company of Nevada
## Final Statement

| | |
|---|---|
| 6.  File Number 101-2098317 | |
| 7.  Loan Number | |
| 8.  Mortgage Insurance Case Number | |

Note:  This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside this closing, they are shown here for informational purposes and are not included in the totals. Amounts shown at R0L were retained by lender and deducted from the loan proceeds prior to receipt by settlement agent.

**Name of Borrower:** Perry S Klein, Rita Klein
20 Rue Grimaldi Way, Henderson, NV 89011

**Name of Seller:** BRJ Limited Partnership
1600 Lake Las Vegas Parkway Henderson 89011

**Name of Lender:** Bankwest
2700 W. Sahara
Las Vegas, NV

**Property Location:** 6 Via Del Garda, Henderson, NV 89011

**Settlement Agent:** First American Title Company of Nevada
Address: 2490 Paseo Verde Parkway #100, Henderson, NV 89074

**Place of Settlement Address:** 2490 Paseo Verde Parkway #100, Henderson, NV 89074

I.
Settlement Date:
Print Date: 09/29/2003, 9:25 AM
Disbursement Date: 09/26/2003

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100. Gross Amount Due From Borrower | | 400. Gross Amount Due To Seller | |
| 101. Contract Sales Price | 300,000.00 | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 31,878.54 | 403. Total Deposits | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes  09/26/03 to 01/01/04 @$2425.84/yr | 640.15 | 407. County taxes | |
| 108. Assessments  05/01/03 to 09/26/03 @$1515.93/semi | 1,221.17 | 408. Assessments | |
| 109. HOA Dues 09/26/03 to 01/01/04 @$1308.00/qtr | 1,380.67 | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 120. Gross Amount Due From Borrower | 335,120.53 | 420. Gross Amount Due To Seller | |
| 200. Amounts Paid By Or In Behalf of Borrower | | | |
| 201. Deposit or earnest money | 155,141.83 | | |
| 202. Principal amount of new loan(s) | 150,000.00 | | |
| 203. Existing loan(s) taken subject | | | |
| 204. Non-developer financing | 15,000.00 | | |
| 205. Multi Lot Credit | 15,000.00 | | |
| 206. | | | |
| 207. | | | |
| 208. | | | |
| 209. | | | |
| Adjustments for items unpaid by seller | | | |
| 210. City/town taxes | | | |
| 211. County taxes | | | |
| 212. Assessments | | | |
| 213. | | | |
| 214. | | | |
| 215. | | | |
| 216. | | | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/For Borrower | 335,141.83 | 520. Total Reduction Amount Due Seller | |
| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | |
| 301. Gross amount due from Borrower (line 120) | 335,120.53 | 601. Gross amount due to Seller (line 420) | |
| 302. Less amounts paid by/for Borrower (line 220) | 335,141.83 | 602. Less reductions in amounts due to Seller (line 520) | |
| 303. Cash ( From) (X To) Borrower | 21.30 | 603. | |

*Handwritten notes:*
8/25/03 — CK # 128
FROM PRUDENTIAL
HELOC
DEPOSIT
$15,000 — EARNEST

9/24/03 — CK # 7543
CASHIERS CHECK
FROM BANK WEST
$140,141.83
TOTAL 155,141.83

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Settlement Agent.                                                Date: 9/29/03

EXHIBIT "2"

PERRY S KLEIN
RITA A KLEIN
20 RUE GRIMALDI WAY
HENDERSON NV 89011

128

60-73/433

Date 8/25/03

Pay to the order of _1st American Title_____ | $ 15,000 —

_Fifteen thousand_____ Dollars

**Prudential 🔷 Financial**
PNC Bank, N.A. Pittsburgh, PA  084

For_____

⑆043300738⑆840481093153114⑈ 0128

— LOC —

$15,000.⁰⁰

DEPOSIT / EARNEST

6 VIA DEL GARDA

PURCHASE

**EXHIBIT "3"**

First American Title Company of Nevada, Henderson
PR. 32004 Ofc. 101
(SC/SC)

DATE: 09/03/2003    FILE NO. 107-2034760    SETTLEMENT DATE: 09/03/2003    CHECK AMOUNT: $471,352.53    CHECK NO.    10147666

BUYER:    Frank Hahn and June Hahn, Trustees

Property Address:    20 Rue Grimaldi Way, Henderson, NV 89011
Lot 26

SELLER:    Klein

Re:

Seller Proceeds

Charge Details:

Thank you for doing business with First American Title Company of Nevada

SETTLEMENT
CHECK FROM
SALE OF OUR
HOME
20 RUE GRIMALDI)

EXHIBIT "4"



No. 512261975

93-541
920

DATE:    SEPTEMBER 04, 2003

SEVENTY ONE THOUSAND THREE HUNDRED FIFTY TWO DOLLARS AND 53 CENTS

PAY

TO THE
ORDER OF:    PERRY OR RITA KLEIN

$71,352.53

Drawer: USBank
420

Location:    13773
Issued By Traveler's Express Company, Inc
Drawee Perfected Bank Los Angeles, CA

BWChecking

NON NEGOTIABLE

AUTHORIZED SIGNATURE

---

PURPOSE/REMITTER: PERRY OR RITA KLEIN



No. 512261973

93-541
920

DATE:    SEPTEMBER 04, 2003

ONE HUNDRED FIFTY THOUSAND DOLLARS AND 00 CENTS

PAY
THE
ORDER OF:    PERRY OR RITA KLEIN

$150,000.00

Drawer: USBank
420

Location:    13773
Issued By Traveler's Express Company, Inc
Drawee Perfected Bank Los Angeles, CA

NFCU

WE WENT DIRECTLY
TO US BANK + GOT
DRAFTS AND DEPSIND
THEM IN DIFFERENT
ACCOUNTS

NON NEGOTIABLE

AUTHORIZED SIGNATURE

---

PURPOSE/REMITTER: PERRY OR RITA KLEIN



No. 512261974

93-541
920

CLOSING FUNDS
CAME FROM
THIS ACCT.

DATE:    SEPTEMBER 04, 2003

TWO HUNDRED FIFTY THO

PAY

TO THE
ORDER OF:    PERRY OR RITA KLEIN

BANK WEST
SAVINGS

$250,000.00

Drawer: USBank
420

Location:    13773
Issued By Traveler's Express Company, Inc
Drawee Perfected Bank Los Angeles, CA

BW SAVINGS

NON NEGOTIABLE

AUTHORIZED SIGNATURE

EXHIBIT "5"

PURCHASER'S RECEIPT - RETAIN FOR YOUR RECORDS

## BankWest
O F   N E V A D A

**77543**

94-177/1224

REMITTER

RITA AND PERRY KLEIN

09/24      03

PAYABLE TO        *****1ST AMERICAN TITLE COMPANY*****        $140,141.83*

******$140,141 DOLLARS AND 83 CENTS

MEMORANDUM

## CASHIER'S CHECK

IL 04-01 FOR VIA DEL GARDA

FOR

NOT NEGOTIABLE

CASHIERS
CHECK FROM
DEPOSIT OF
SETTLEMENT
CHECKS

**EXHIBIT "6"**



First American Title Company of Nevada
2490 Paseo Verde Parkway #100 Henderson, NV 89074

PR: 32004          Ofc: 101

DATE:            09/25/2003
RECEIPT NO.:   10117960
FILE NO.:       101-2098317

### RECEIPT FOR DEPOSIT

FUNDS IN THE AMOUNT OF: $140,141.83

WERE RECEIVED FROM: Perry S Klein / Rita Klein

CREDITED TO THE ACCOUNT OF:

TYPE OF DEPOSIT: Cashier's Check          REPRESENTING: Funds For Closing

Comments:

Property Location: 6 Via Del Garda, Henderson, NV 89011

DEPOSITED CHECK INFORMATION:
Check No.:          77543
ABA No.:            94177
Bank Name:         Bank West
Account Number:    122401778

BY: Nita L. Jetland, 09/25/2003

ESCROW OFFICER: Nita Jetland

"The validity of this receipt, for the deposit referenced,
is subject to clearance by the depository financial institution and credit to our account."

---

REMITTER
RITA AND PERRY KLEIN

**BankWest** OF NEVADA

20983_ NI-J  77543
10177960
94-177/1224

DATE   09/24    03

PAY TO THE
ORDER OF   *****1ST AMERICAN TITLE COMPANY****          |$ $140,141.83|

*****$140,141 DOLLARS AND 83 CENTS          DOLLARS

This document has a micro-print signature line, and a holographic foil title; absence of these features will indicate a copy.

VOID AFTER 90 DAYS

### CASHIER'S CHECK
JL 04-01 FOR VIA DEL GARDA

"077543" :122401778: 0130000049"

2490 Paseo Verde Parkway #100 · Henderson, NV 89074

## Buyer's Estimated Settlement Statement

Property: 6 Via Del Garda, Henderson, NV 89011
Lot: 39

File No: 101-2098317
Officer: Nita Jetland/NLJ
New Loan No:
Settlement Date:
Disbursement Date:
Print Date:          9/25/2003, 3:04 PM

Buyer:   Perry S Klein, Rita Klein
Address: ~~20 Rue Grimaldi Way, Henderson, NV 89011~~   2 RUE ALLARD WAY HEND, NV. 89011
Seller:  BRJ Limited Partnership
Address: 1600 Lake Las Vegas Parkway, Henderson 89011

| Charge Description | Buyer Charge | Buyer Credit |
|---|---|---|
| Consideration: | | |
| Total Consideration | 300,000.00 | |
| | | |
| Deposits in Escrow: | | |
| Receipt No. 10117227 on 09/03/2003 by Perry S Klein | | 15,000.00 |
| | | |
| Adjustments: | | |
| Non-developer financing | | 15,000.00 |
| Multi Lot Credit | | 15,000.00 |
| | | |
| Prorations: | | |
| County Tax 09/26/03 to 01/01/04 @$2425.84/yr | 640.15 | |
| Assessments 05/01/03 to 09/26/03 @$1515.93/semi | 1,221.17 | |
| Association Dues 09/26/03 to 01/01/04 @$1308.00/qtr | 1,380.67 | |
| | | |
| New Loan(s): | | |
| Lender: Bankwest | | |
| New Loan to File  to Bankwest | | 150,000.00 |
| Loan Discount Points 1.0000% to Bankwest | 1,500.00 | |
| | | |
| Title/Escrow Charges to: | | |
| ALTA Lenders 1992 to First American Title Company of Nevada | 213.00 | |
| Endorsement 103.1,110.1 to First American Title Company of Nevada | 46.30 | |
| | | |
| Disbursements Paid: | | |
| Lake Maintenance Fee to Lake Las Vegas Master Association | 74.00 | |
| Transfer Fee to Lake Las Vegas Master Association | 75.00 | |
| | | |
| Cash (X From) ( To) Borrower | | 110,150.29 |
| | | |
| | 305,150.29 | 305,150.29 |

*(handwritten notes: EARNEST DEPOSIT, CK#122 PROVIDENTIAL HELOC)*

Notice - This Estimated Settlement Statement is subject to changes, corrections or additions at the time of final computation of the Settlement Statement.

BUYER(S):

_____
Perry S Klein

_____
Rita Klein

Initials: _____

## First American Title Company of Nevada

2490 Paseo Verde Parkway #100, Henderson, NV 89074
(702) 731-4131, (702) 454-8939 FAX
www.fatcolv.com

### PRELIMINARY TITLE REPORT

09/05/2003

Lake at Las Vegas Resort
1605 Lake Las Vegas Parkway
Henderson, NV 89011

Reference :
Our order no.: 101-2098317 NLJ/JS   Nita Jetland

Form of policy coverage requested:  Plain Language Policy, ALTA Lenders 1992
Buyer: Perry S Klein
Property reference:   6 Via Del Garda, Henderson, NV

In response to the above referenced application for a policy of title insurance, this company hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a policy of title insurance (through First American Title Insurance Company, a California Corporation) in the form specified above, describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception below or not excluded from coverage pursuant to the printed schedules, conditions and stipulations of said policy form(s).

This report (and any supplements or amendments thereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby.  If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a binder or commitment should be requested.

Dated as of  September 04, 2003, at 7:30 a.m.

Title to said estate or interest at the date hereof is vested in:

BRJ Limited Partnership, a Nevada Limited Partnership

The estate or interest in the land hereinafter described or referred to covered by this report is:

Fee

The Undersigned hereby acknowledges that
7 in 4 [illegible] and approved this prelim
and accepts [illegible] the exceptions of
[illegible]
By:
By:

101-2098317                                      2

At the date hereof exceptions to coverage in addition to the printed exceptions and exclusions contained in said policy form would be as follows:

1.    Water rights, claims or title to water, whether or not shown by the public records.

2.    Any taxes that may be due, but not assessed, for new construction which can be assessed on the unsecured property rolls, in the Office of the Clark County Assessor, per Nevada Revised Statute 361.260.

3.    Those taxes for the fiscal year July 1, 2003 through June 30, 2004, including any secured personal property taxes collected by the County Treasurer.

APN 160-23-515-012

| | | |
|---|---|---|
| 1st installment | $ | 805.10   PAID |
| 2nd installment | $ | 540.26 |
| 3rd installment | $ | 540.24 |
| 4th installment | $ | 540.24 |
| | | |
| Total | $ | 2,425.84 |

NOTE:
Said taxes become a lien on July 1, 2003, each installment will become due and payable on the following dates:
1st installment is due on the 3rd Monday of August, 2003.
2nd installment is due on the 1st Monday of October, 2003.
3rd installment is due on the 1st Monday of January, 2004.
4th installment is due on the 1st Monday of March, 2004.

Each installment will become delinquent ten (10) days after due.

4.    Reservations and provisions as contained in Patent from the United States of America, recorded July 25, 1966, in Book 7733 of Official Records, as Instrument No. 589133.

5.    Covenants, conditions, restrictions, easements, assessments, liens, charges, terms and provisions in the document recorded September 30, 1999 in Book No. 990930 as Instrument No. 02012 which purports to amend and restate in its entirety that certain instrument recorded December 30, 1991 in Book 911230 of Official Records as Document No. 01134 and any subsequent amendments thereto of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604(C), of United States Codes.

•    The right to levy certain charges or assessments against the land which shall become a lien if not paid as set forth in the above declaration of restrictions, and is conferred upon Southshore Residential Association.

•    A document entitled "An Amended and Restated Assignment of Declarant's Rights", executed by and between Lake at Las Vegas Joint Venture, a Nevada General Partnership and Wells Fargo National Association, recorded June 26, 2000, in Book 20000626 as Instrument No. 02125 of Official Records.

•    A document declaring modifications thereof recorded August 30, 2000 in Book No. 20000830 as Instrument No. 02680 of Official Records.

•    A document declaring modifications thereof recorded July 1, 2020 in Book No. 20020701 as Instrument No. 02584 of Official Records.

101-2098317                                           3

6.  A document entitled "Assignment of Rights", recorded by Green Lake at Las Vegas Venture, a Nevada general partnership and The Governor and Company of the Bank of Scotland, incorporated by Act of Parliament and TRILYN LLV 1, LLC and their respective successors and assigns, recorded November 12, 2002, in Book 20021112 as Instrument No. 01092 of Official Records.

7.  A City of Henderson Improvement District assessment, as disclosed by the final assessment roll Local Improvement District No. T-1, recorded January 19, 1994, in Book 940119 as Instrument No. 02069 of Official Records.

•   The last mentioned item was also recorded February 6, 2001 in Book 20010206 as Instrument No. 02062 of Official Records.

8.  Covenants, conditions, and restrictions in a Supplemental Declaration recorded December 30, 1997, in Book 971230 as Instrument No. 02764 of Official Records.

•   A document declaring modifications thereof recorded July 1, 2002 in Book No. 20020701 as Instrument No. 02584 of Official Records.

9.  A Deed of Trust to secure an original indebtedness of $5,736,000.00, and any other amounts or obligations secured thereby, recorded December 30, 1997, in Book 971230, as Instrument No. 02766.

    Dated:          December 22, 1997
    Trustor:        BRJ Limited Partnership, a Nevada Limited Partnership
    Trustee:        First Republic Bank, a Nevada corporation
    Beneficiary:    First Republic Bank, a corporation

•   A document recorded May 28, 1999 in Book No. 990528 as Instrument No. 00119 of Official Records provides that the Deed of Trust or the obligation secured thereby has been modified.

10. A Financing Statement recorded December 30, 1997 in Book No. 971230 as Instrument No. 02767 of Official Records.

    Debtor:         BRJ Limited Partnership, a Nevada Limited Partnership
    Secured party:  First Republic Bank

•   An Amendment to the Financing Statement was recorded May 28, 1999 in Book No. 9909528 as Instrument No. 00120 of Official Records.

11. An Easement for public utilities and incidental purposes, recorded March 2, 1998 in Book No. 980302 as Instrument No. 01722 of Official Records.

    Granted to:     Nevada Power Company
    Affects:        A portion of said land.

12. An Easement for public utilities and incidental purposes, recorded March 25, 1998 in Book No. 980325 as Instrument No. 00730 of Official Records.

    Granted to:     Nevada Power Company
    Affects:        A portion of said land.

13. An easement for Additional Bypass Facilities Agreement dated March 14, 1989 by Eslyn Brenner, R.L.S. recorded July 12, 1989 in Book 890712 of Official Records, Clark County, Nevada records, as Document No. 00867 and as amended by first amendment to easement agreement recorded June 8, 1993 in Book 930608 as Document No. 01036, and as amended by second amendment to easement agreement recorded January 31, 1994 in Book 940131 as Document No. 01090 and as amended by third amendment recorded

March 22, 1996 in Book 960322 as Document No. 00621 as amended by fourth
amendment recorded December 23, 1998 in Book 981223 as Document No. 01032.

14.  Easements as shown and/or dedicated upon the final map of Lake Las Vegas Parcel 19 Phase 1, on file in
     Book 88 of plats, Page 73 , of Official Records.

15.  A Local Improvement District assessment, as disclosed by the final assessment roll Local Improvement
     District No. T-1, recorded March 20, 2003, in Book 20030320 as Instrument No. 01490 of Official
     Records.

**NOTE:**    This Report is preparatory to the issuance of an ALTA Policy of Title Insurance. We
             have no knowledge of any fact which would preclude the issuance of said ALTA
             Policy with Endorsements 100 and 116 attached.

             There is located on the land a single family residence known as 6 Via Del Garda,
             Henderson, NV

             Current Assessor's Parcel No. 160-23-515-012

             (Note this number may be different from the Assessor's Parcel Number being used to
             pay current fiscal year taxes)

                              * * * * * * * * * *

101-2098317                                        5

## DESCRIPTION

All that real property situated in the County of Clark , State of Nevada, bounded and described as follows:

Lot 39 in Block A of Lake Las Vegas Parcel 19 Phase 1, as shown by map thereof on file in Book 88 of Plats, Page 73, in the Office of the County Recorder of Clark County, Nevada.

* * * * * * * * * *

Julie Skinner, Title Officer

NLJ

101-2098317                                                    6

File Number: 101-2098317

# EXHIBIT "A"

## LEGAL DESCRIPTION

Lot 39 in Block A of Lake Las Vegas Parcel 19 Phase 1, as shown by map thereof on file in Book 88 of Plats, Page 73, in the Office of the County Recorder of Clark County, Nevada.

101-2098317

7

8

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $150,000.00 | 09-22-2003 | 09-28-2006 | 208317525 | 6340 | 1017 | 268 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  PERRY S. KLEIN
RITA S. KLEIN
20 RUE GRIMALDI WAY
HENDERSON, NV 89011

**Lender:**  BankWest of Nevada
Henderson Branch
2890 N. Green Valley Pkwy
Henderson, NV 89014
(702) 451-0624

*LoT Loan
FoR BaLaNcE*

**LOAN TYPE.** This is a Variable Rate Disclos: published in the Wall Street Journal. When a with an interest rate ceiling of 21.000%, curre

:0 due on September 28, 2006. The reference rate (Prime rate as higher rates will be used, with an interest rate floor of 5.750%, and 750%, resulting in an initial rate of 5.750.

**PRIMARY PURPOSE OF LOAN.** The primar                    ):

☒ _____ Personal, Family, or Household Purposes or Personal Investment.

☐ _____ Business (including Real Estate Investment).

**SPECIFIC PURPOSE.** The specific purpose of this loan is:  TO PURCHASE A RESIDENTIAL LOT.

**DISBURSEMENT INSTRUCTIONS.** I understand that no loan proceeds will be disbursed until all of Lender's conditions for making the loan have been satisfied.  Please disburse the loan proceeds of $150,000.00 as follows:

| | |
|---|---|
| Amount paid to others on my behalf: | $148,262.00 |
| $148,262.00 to FIRST AMERICAN TITLE COMPANY | |
| Other Charges Financed: | $238.00 |
| $213.00  Title Insurance | |
| $25.00  Title Endorsement: 103.1 Cost | |
| Total Financed Prepaid Finance Charges: | $1,500.00 |
| $1,500.00  Points | |
| | |
| Note Principal: | $150,000.00 |

**FINANCIAL CONDITION.**  BY SIGNING THIS AUTHORIZATION, I REPRESENT AND WARRANT TO LENDER THAT THE INFORMATION PROVIDED ABOVE IS TRUE AND CORRECT AND THAT THERE HAS BEEN NO MATERIAL ADVERSE CHANGE IN MY FINANCIAL CONDITION AS DISCLOSED IN MY MOST RECENT FINANCIAL STATEMENT TO LENDER. THIS AUTHORIZATION IS DATED SEPTEMBER 22, 2003.

**BORROWER:**

X _____
PERRY S. KLEIN, Individually

X _____
RITA S. KLEIN, Individually

---

## CREDIT INSURANCE DISCLOSURE

**VOLUNTARY CREDIT INSURANCE.**  CREDIT LIFE INSURANCE, CREDIT DISABILITY INSURANCE AND INVOLUNTARY UNEMPLOYMENT INSURANCE ARE NOT REQUIRED TO OBTAIN CREDIT.

By signing below, I acknowledge that I am not obtaining credit insurance for this loan for one of the following reasons:
(A)  I am not eligible for credit insurance;
(B)  Credit insurance is not available from Lender; or
(C)  If I am eligible and credit insurance is available from Lender, I do not want it.

Prior to signing this Credit Insurance Notice on September 22, 2003, I read and understood all of the provisions of this Disclosure.

**BORROWER:**

X _____
PERRY S. KLEIN, Individually

X _____
RITA S. KLEIN, Individually

LASER PRO Lending, Ver. 5.11.10.003, Copr. Harland Financial Solutions, Inc. 1997, 2003. All Rights Reserved. - NV T:\CFI\WIN\CFI\LPL\G54.FC  TR-11132  PR-28

PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $150,000.00 | 09-22-2003 | 09-28-2006 | 208317525 | 5340 | 1017 | 268 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

| Borrower: | PERRY S. KLEIN | | Lender: | BankWest of Nevada |
| | RITA S. KLEIN | | | Henderson Branch |
| | 20 RUE GRIMALDI WAY | | | 2890 N. Green Valley Pkwy |
| | HENDERSON, NV 89011 | | | Henderson, NV 89014 |
| | | | | (702) 451-0624 |

---

**Principal Amount: $150,000.00**      **Initial Rate: 5.750%**      **Date of Note: September 22, 2003**

**PROMISE TO PAY.** I ("Borrower") jointly and severally promise to pay to BankWest of Nevada ("Lender"), or order, in lawful money of the United States of America, the principal amount of One Hundred Fifty Thousand & 00/100 Dollars ($150,000.00), together with interest on the unpaid principal balance from September 22, 2003, until paid in full. The interest rate will not increase above 21.000%.

**PAYMENT.** I will pay this loan in one principal payment plus interest on September 28, 2006. This payment due on September 28, 2006, will be for all principal and all accrued interest not yet paid. In addition, I will pay regular monthly payments of all accrued interest due as of each payment date, beginning October 28, 2003, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied to Finance Charges first; then to unpaid principal; then to late charges and other charges. Interest on this Note is computed on a 365/365 simple interest basis; that is, by applying the ratio of the annual interest rate over the number of days in a year, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. I will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Prime rate as published in the Wall Street Journal. When a range of rates has been published, the higher rates will be used (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notice to me. Lender will tell me the current Index rate upon my request. The interest rate change will not occur more often than each day. I understand that Lender may make loans based on other rates as well. The interest rate change will be 4.000% per annum. The interest rate to be applied to the unpaid principal balance of this Note will be at a rate of 1.750 percentage points over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 5.750% per annum. Notwithstanding the foregoing, the variable interest rate or rates provided for in this Note will be subject to the following minimum and maximum rates. NOTICE: Under no circumstances will the interest rate on this Note be less than 5.750% per annum or more than 21.000% per annum. Whenever increase in the interest rate will increase the amounts of my interest payments.

**PREPAYMENT.** I agree that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be refunded to me upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, I may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve me of my obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due. I agree not to send Lender payments marked "paid in full", "without recourse", or similar language. If I send such a payment, Lender may accept it without losing any of Lender's rights under this Note, and I will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: BankWest of Nevada, Henderson Branch, 2890 N. Green Valley Pkwy Henderson, NV 89014.

**LATE CHARGE.** If a payment is 15 days or more late, I will be charged 6.000% of the regularly scheduled payment or $5.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, Lender, at its option, may, if permitted under applicable law, increase the variable interest rate on this Note to 6.750 percentage points over the Index. The interest rate will not exceed the maximum rate permitted under applicable law.

**DEFAULT.** I will be in default under this Note if any of the following happen:

**Payment Default.** I fail to make any payment when due under this Note.

**Break Other Promises.** I break any promise made to Lender or fail to perform promptly at the time and strictly in the manner provided in this Note or in any agreement related to this Note, or in any other agreement or loan I have with Lender.

**False Statements.** Any representation or statement made or furnished to Lender by me or on my behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished.

**Death or Insolvency.** Any Borrower dies or becomes insolvent; a receiver is appointed for any part of my property; I make an assignment for the benefit of creditors; or any proceeding is commenced either by me or against me under any bankruptcy or insolvency laws.

**Taking of the Property.** Any creditor or governmental agency tries to take any of the property or any other of my property in which Lender has a lien. This includes taking of, garnishing of or levying on my accounts with Lender. However, if I dispute in good faith whether the claim on which the taking of the property is based is valid or reasonable, and if I give Lender written notice of the claim and furnish Lender with monies or a surety bond satisfactory to Lender to satisfy the claim, then this default provision will not apply.

**Defective Collateralization.** This Note or any of the related documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Collateral Damage or Loss.** Any collateral securing this Note is lost, stolen, substantially damaged or destroyed and the loss, theft, substantial damage or destruction is not covered by insurance.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note. In the event of a death, Lender, at its option, may, but shall not be required to, permit the guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Cure Provisions.** If any default, other than a default in payment is curable and if I have not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured (and no event of default will have occurred) if I, after receiving written notice from Lender demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, and then I will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if I do not pay. I will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, I also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by and interpreted in accordance with federal law and the laws of the State of Nevada. This Note has been accepted by Lender in the State of Nevada.

**CHOICE OF VENUE.** If there is a lawsuit, I agree upon Lender's request to submit to the jurisdiction of the courts of Clark County, State of Nevada. (Initial Here _____ )

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all my accounts with Lender (whether checking, savings, or some other account). This includes all accounts I hold jointly with someone else and all accounts I may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. I authorize Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** I acknowledge this Note is secured by the following collateral described in the security instrument listed herein, all the terms and conditions of which are hereby incorporated and made a part of this Note: a Deed of Trust dated September 22, 2003, to a trustee in favor of Lender on real property located in CLARK County, State of Nevada.

Assessor Parcel No(s):
    160-23-515-012

RECORDATION
    REQUESTED BY:
    BankWest of Nevada
    Henderson Branch
    2890 N. Green Valley Pkwy
    Henderson, NV 89014

WHEN RECORDED MAIL
    TO:
    BankWest of Nevada
    Henderson Branch
    2890 N. Green Valley Pkwy
    Henderson, NV 89014

SEND TAX NOTICES TO:
    PERRY S. KLEIN
    RITA S. KLEIN
    20 RUE GRIMALDI WAY
    HENDERSON, NV 89011                                    FOR RECORDER'S USE ONLY

## DEED OF TRUST

THIS DEED OF TRUST is dated September 22, 2003, among PERRY S. KLEIN and RITA S. KLEIN, HUSBAND AND WIFE AS JOINT TENANTS, whose address is 20 RUE GRIMALDI WAY, HENDERSON, NV 89011 ("Grantor"); BankWest of Nevada, whose address is Henderson Branch, 2890 N. Green Valley Pkwy, Henderson, NV 89014 (referred to below sometimes as "Lender" and sometimes as "Beneficiary"); and FIRST AMERICAN TITLE COMPANY OF NEVADA, whose address is 3760 PECOS-MCLEOD #7, LAS VEGAS, NV 89121 (referred to below as "Trustee").

CONVEYANCE AND GRANT. For valuable consideration, Grantor irrevocably grants, bargains, sells and conveys to Trustee with power of sale for the benefit of Lender as Beneficiary all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in CLARK County, State of Nevada:

SEE ATTACHED EXHIBIT "A"

The Real Property or its address is commonly known as 6 VIA DEL GARDA, HENDERSON, NV 89011. The Real Property tax identification number is 160-23-515-012

Grantor presently, absolutely, and irrevocably assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property.

THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS INCLUDING FUTURE ADVANCES AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS DEED OF TRUST. THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

PAYMENT AND PERFORMANCE. Except as otherwise provided in this Deed of Trust, Grantor shall pay to Lender all amounts secured by this Deed of Trust as they become due, and shall strictly and in a timely manner perform all of Grantor's obligations under the Note, this Deed of Trust, and the Related Documents.

STATUTORY COVENANTS. The following Statutory Covenants are hereby adopted and made a part of this Deed of Trust: Covenants Nos. 1, 3, 4, 5, 6, 7, 8 and 9 of N.R.S. 107.030. The rate of interest after default for Covenant No. 4 shall be 6.750 percentage points over the variable rate index defined in the Note. The percent of counsel fees under Covenant No. 7 shall be ten percent(10%). Except for Covenants Nos. 6, 7, and 8, to the extent any terms of this Deed of Trust are inconsistent

RECORDED AT THE REQUEST OF
FIRST AMERICAN TITLE COMPANY OF

RPPT: $ __750.00__
APN: __(500) 160-23-515-012__

Escrow No.: __101-2098317    (NJ)__

09-26-2003        09:43        SUO

OFFICIAL RECORDS

BOOK/INSTR:20030926-02394

PAGE COUNT:        2

FEE:            15.00
RPTT:          750.00

When Recorded Mail To
And Send Tax Statements To:
Perry & Rita Klein
~~20 Rue Grimaldi Way~~    2 Rue Allard Way
Henderson, NV 89011

## GRANT, BARGAIN, SALE DEED

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, BRJ Limited Partnership, a Nevada limited partnership ("Grantor") hereby GRANTS to __Perry S. Klein and Rita S. Klein, Husband and Wife as Joint Tenants__ ("Grantee") the following described real property in the City of Henderson, County of Clark, State of Nevada:

Lot __39__ in Block A of Amended Map of Lake Las Vegas, Parcel 19, Phase 1 as shown by map thereof on file in Book __88__ of Plats, Page __73__, in the Office of the County Recorder of Clark County, Nevada.

EXCEPTING AND RESERVING unto Grantor:

1. All those certain easements, reservations, rights, and rights of way set forth in that certain Master Declaration of Covenants, Conditions and Restrictions and Reservation of Easements recorded on December 30, 1991, as Instrument No. 01134 in Book 911230 of Official Records of Clark County, Nevada, as amended and supplemented (the "Declaration"); and

2. All waters and water rights appurtenant to the above-described real property or used in connection therewith, as more particularly set forth in the Declaration.

3. That certain Shoreline Control Zone Easement as shown on the recorded Map of the above-described real property.

THIS GRANT IS MADE and accepted subject to:

1. Real property taxes and assessments not delinquent.

1

EXHIBIT "8"

### First American Title Company of Nevada
**2490 Paseo Verde Parkway #100, Henderson, NV 89074**
**(702) 731-4131,  (702) 492-1871 FAX**

## *Escrow Instructions*

| | |
|---|---|
| Escrow Officer: | Deb Karpinski |
| Escrow Number: | 101-2119347 (dk) |
| Subject Property: | 6 Via Del Garda, Henderson, NV |
| Buyer(s): | Timothy Carey and Virginia Carey |
| Seller(s): | Perry S. Klein and Rita S. Perry |
| Date: | January 29, 2004 |

I/We the sellers,Perry S. Klein and Rita S. Perry hereby agree to sell and I/We the buyers, Timothy Carey and Virginia Carey hereby agree to buy the herein described property for a total sales price of $329,900.00.  On or before 01/30/2004 the buyer(s) will hand Escrow Holder said consideration which is payable as follows:

| | |
|---|---|
| $10,000.00 | Earnest Money Deposit held by Escrow Holder to be applied towards buyer's down payment and/or closing costs.  Buyer to deposit into escrow the balance of funds required for down payment in certified funds prior to close of escrow and shall apply and qualify for a new conventional loan. |
| $329,900.00 | Total Sale Price of Subject Property |

**Buyer agrees to deposit any additional funds and execute any instruments which are necessary to comply with the terms herein, all of which First American Title Company of Nevada, a Nevada Corporation is authorized to use when Escrow Holder is in possession of a conveyance deed executed by Perry S. Klein and Rita S. Perry and when First American Title Company of Nevada, a Nevada Corporation can issue a policy of title insurance with a liability amount of $329,900.00 on the following described property situated in the County of Clark , State of Nevada .**

LOT 39 IN BLOCK A OF AMENDED MAP OF LAKE LAS VEGAS, PARCEL 19, PHASE 1, AS SHOWN BY MAP THEREOF ON FILE IN BOOK 88 OF PLATS, PAGE 73, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

PROPERTY COMMONLY KNOWN AS: 6 Via Del Garda

Buyer hereby agrees to take title to the subject property free of encumbrances except the following:

- A portion of General and Special taxes for the current fiscal year
- The lien of supplemental taxes which may be assessed as a result of revised assessed values
- Assessments; bonds; Special Improvement District (SID); Local Improvement District (LID) and/or bonds
- Covenants, conditions, restrictions, rights of way, easements and reservations as described in that certain preliminary title report, issued or to be issued herein

Buyer's Initials _____  _____        Seller's Initials _____  _____

Deed of Trust to record securing a new conventional loan payable per lender's terms and conditions. Buyer's execution of loan documents shall be considered their approval of the terms and conditions contained therein. If the lender requires Private Mortgage Insurance (PMI) the buyers at their option, may finance a portion or the entire PMI premium. Escrow Holder is hereby directed to comply with all lenders' requirements.

**Buyer's Closing Costs**
Buyer agrees to pay customary conventional closing costs incurred in this transaction, including, but not limited to, loan origination fee, credit report charges, tax service fee, processing fee, underwriting fee, pre-paid interest, impound account, as required, lender's policy of title insurance, one-half of the escrow fee, overnight delivery charges, if required, recordation charges for the deed conveying title to the subject property and any deeds of trust in connection with the loan and any other fees as required by the lender and/or customary in Clark County, Nevada.

**Seller's Closing Costs**
Seller agrees to pay customary closing costs incurred in this transaction, including, but not limited to the owner's policy of title insurance, one-half of the escrow fee, payoff/beneficiary demand fees, real property transfer tax, overnight delivery charges, as required, recordation fees in connection with any release documents and any other Seller's fees as customary in Clark County, Nevada.

**Century 21 Aadvantage Gold Fees**
The Buyer hereby agrees to pay a Document Warehousing Fee of $195.00 and an additional Broker Administration Fee of $300.00 to Century 21 Aadvantage Gold at the close of this escrow. Escrow Holder is hereby authorized and instructed to debit the account of the buyer and disburse funds accordingly at the close of this escrow.

**Appraisal**
Buyer agrees to provide the necessary appraisal as required. Appraisal conditions that the seller hereby agrees to satisfy are not to exceed $500.00.

**Homeowner's Association**
The buyer understands and agrees that there are presently maintenance fees due on the subject property, to the homeowners association. Escrow Holder is instructed to obtain a statement from the associations and to charge the seller's account at the close of escrow with any outstanding dues, liens, and/or assessments owed by the seller. Escrow Holder is instructed to charge the buyer's account with the next installment due and remit same to the association at the close of this escrow.

The buyer agrees to pay the transfer fee, including statement or administrative fee, if any, incurred in this transaction.

The buyer is aware that the subject property is part of a common-interest development and therefore subject to all terms and conditions as set out under the association's Covenants, Conditions, Restrictions and Reservations, hereafter referred to as CC&Rs and subject to the association by-laws. Seller will furnish to buyer, outside of escrow, prior to the close of escrow, a copy of CC&Rs, by-laws, Articles of Incorporations, Budget, Annual Review and Statement of Lien Policy for the Association. Buyer's deposit of final closing costs and/or signature of loan documents shall constitute approval of the aforementioned items and no further approval is required.

**Approval of Association Documents**
Within seven (7) calendar days from January 23, 2004, Seller to deliver to Buyer a copy of the "Certificate of Resale" from the HOA. Buyer shall give written approval of said documents within five (5) calendar days after receipt of same. Failure on the part of the Buyer to provide written approval shall be deemed either parties right to terminate this escrow.

Buyer's Initials _____  _____        Seller's Initials _____  _____

**Contingent Upon Interest Rate**
This escrow is contingent upon the Buyer securing an interest rate not to exceed 8%. Receipt of loan documents reflecting said interest rate shall be deemed as release of this contingency. In the event this contingency is not released, Escrow Holder will receive further written instructions from the herein parties.

**Preliminary Title Report Approval**
Buyer shall have ten (10) days following receipt of a preliminary title report to approve of said report. In the absence of written disapproval from the buyer within the specified time limit, the preliminary title report shall be deemed approved and this contingency thereby released. In the event Escrow Holder receives written disapproval, Escrow Holder shall receive further written instructions from the herein parties as to how to proceed with this transaction.

**Insurance Requirements**
The buyer hereby agrees to provide a new fire/hazard insurance policy, satisfactory to the new lender, and to pay the first year's premium through the close of this escrow. Escrow Holder is hereby authorized and directed to debit the account of the buyer with the premium of the insurance policy at the close of escrow.

**Escrow Holder is not to assume any liability and/or responsibility in connection with ordering said insurance policy or as to the terms and conditions contained therein. Escrow Holder's sole responsibility is for the collection and payment of the premium, as provided.**

**Additional Terms**
Offer subject to neighbor dock being corrected.

**Demand Fees**
In the event that upon Escrow Holder's ordering of the demand for payoff and/or beneficiary statement(s) on seller's existing loan(s), if any, the lender requires **advance statement fees** Escrow Holder is instructed to **pay any statement fees** from the **buyer's** initial deposit, prior to the close of escrow. Escrow Holder is instructed at the close of escrow to charge the seller's account for same without further approval of the parties hereto. **The parties herein acknowledge that said fees are non-refundable.**

**IRS 1099 Reporting Disclosure**
The herein parties are hereby made aware that Escrow Holder is **required by law** to report the total "gross" proceeds (total consideration/sales price) on all real estate transactions to the IRS at closing. In addition, parties are further made aware that Escrow Holder will also be required by H.R. 6387 "Home Sale Tax Act of 1992" to report to the IRS the amount of real estate property taxes apportioned between the parties at the close of escrow. Seller is to complete, sign and return the 1099B Input Form, provided by Escrow Holder, (all sellers must sign), and this escrow may not close if this form is not received prior to the close of escrow date. This is an IRS requirement, and any questions should be directed to the Treasury Department and not the Escrow Holder. NOTE: Corporations are automatically exempt from IRS 1099 reporting.

**Good Funds Requirements**
The buyer and seller hereby acknowledge and understand that all funds to close escrow, and/or to be released early, must be deposited into escrow in the form of a **cashier's check, certified or teller check drawn on a financial institution or wired into Escrow Holder's depository bank.** It is further acknowledged and understood by the herein parties that in the event funds are not deposited as described above the close of this escrow may be delayed for deposited funds to clear the bank on which they were issued.

Buyer's Initials _____  _____      Seller's Initials _____  _____

**Payoff Loan**

The seller hereby acknowledges and understands that disbursement of any and all payoffs and encumbrances being paid off at the close of escrow must be received by the lender by a specific date to avoid further accrual of interest either daily or monthly. Escrow Holder is hereby instructed by seller to forward all payoff funds to the lender by overnight delivery and to charge the seller for expense of said delivery. In the event the payoff lender demands additional funds after the close of escrow, the seller hereby agrees to deposit any additional funds necessary to comply with lender instructions immediately upon notice of same.

**Prorations**

Buyer and Seller hereby instruct Escrow Holder to prorate and/or adjust the following items at the close of this escrow:

- Taxes based on the amount of the last tax statement issued by the Clark County Tax Collector. (If the amount of the new tax bill issued by the Tax Collector after the close of escrow is more or less than the amount used for proration purposes, the difference, if any, will be adjusted by the parties, outside of this escrow).
- Sewer, if any
- Homeowners Association Dues, if any
- Special Improvement District (SID) or Land Improvement District (LID) , if any
- Rents and Deposits, per written statement provided to Escrow Holder, if any

## MEMORANDUM ITEMS

The following are memorandum items, which the Escrow Holder is not to assume any responsibility and/or liability in connection with same, now or in the future. These items are only mentioned on these escrow instructions as a convenience to the parties hereto:

- Possession to the subject property is to be given to the buyer at the close of escrow, outside the close of escrow.
- Buyer is aware that this property is being sold without any warranties, expressed or implied, unless specifically stated otherwise or as imposed by law.
- The buyers request a walk through inspection of the subject property prior to the close of escrow, in order to ascertain that all conditions have been met.
- Seller agrees to vacate the subject property in a neat and orderly fashion.

**End of Memorandum**

Buyer's Initials _____  _____        Seller's Initials _____  _____

The undersigned buyer hereby agrees and approves of the terms and conditions contained herein and hereby approve of these escrow instructions in their entirety.

Buyer:

_____
Timothy Carey

_____
Virginia Carey

The undersigned seller hereby agrees and approves of the terms and conditions contained herein and hereby approve of these escrow instructions in their entirety. I/We agree to sell and will deliver to First American Title Company of Nevada, a Nevada Corporation all papers, instruments and/or funds required within the time limit specified herein, which you are authorized to use and/or deliver when you can issue your policy of title insurance as set forth in this transaction. I agree to pay any personal property taxes properly charged to me. Escrow Holder is instructed to use the money and record the instruments in order to comply with these instructions and to pay all encumbrances of record necessary, without further approval, including prepayment penalties that may be contained therein.

Seller:

_____
Perry S. Klein

_____
Rita S. Perry

## THE GENERAL PROVISIONS ATTACHED HERETO BY THIS REFERENCE ARE INCORPORATED AND MADE A PART HEREOF.

Buyer's Initials _____  _____        Seller's Initials _____  _____

# ESCROW GENERAL PROVISIONS

**1.    DEPOSIT OF FUNDS & DISBURSEMENTS**
Escrow Holder shall deposit all funds received in this escrow in any financial institution insured by a federal agency of the United States Government, including financial institutions affiliated with Escrow Holder's company, First American Trust Bank in one or more general escrow demand accounts. Unless Escrow Holder is handed a W-9 form and specific investment instructions from the Buyer and Seller, all funds delivered to Escrow Holder pursuant to these instructions will be deposited in a non-interest bearing fiduciary account. These funds may be transferred to any other escrow demand account or accounts, in the above named bank of banks, including those maintained in your affiliated bank. All disbursements shall be made by Escrow Holder's check unless otherwise instructed in writing. Escrow Holder is authorized not to close escrow or disburse until collected funds have been confirmed in escrow.

**2.    GOOD FUNDS LAW**
The parties understand that all funds to close escrow and/or to be released early must be deposited early enough to the date of closing or early release to allow sufficient time for clearance of the funds prior to disbursement. In the event such funds are not in the form of a cashier's certified or teller check drawn on a financial institution, sufficient time must be allowed for clearance to comply with any "good funds" law which is in effect. (For escrows conducted in California, the "good funds" law is Section 12413.1 of the California Insurance Code.) Funds may be wired directly into First American's depository bank account to avoid waiting for clearance.

**3.    PRORATIONS AND ADJUSTMENTS**
The expression "close of escrow" used in this escrow means the date on which documents referred to herein are recorded in the office of the county recorder and relate only to prorations and/or adjustments unless otherwise specified. All prorations and/or adjustments are to be made on the basis of a 30-day month unless otherwise instructed in writing.

**4.    RECORDATION OF INSTRUMENTS/DOCUMENTS**
Escrow holder is authorized to record any documents delivered through this escrow, the recording of which is necessary or proper in the issuance of the requested policy of title insurance.

**5.    AUTHORIZATION TO FURNISH COPIES**
Escrow Holder is to furnish a copy of these instructions, amendments thereto, closing statements and/or any other documents deposited in this escrow to the lender(s), the real estate broker(s), the attorney(s) and/or the accountant(s) involved in this transaction upon request of the lenders, brokers, attorneys, or accountants.

**6.    PERSONAL PROPERTY TAXES**
No examination, UCC Search or insurance as to personal property and/or the amount of payment of personal property taxes is required unless otherwise instructed in writing.

**7.    RIGHT OF CANCELLATION**
Any party instructing Escrow Holder to cancel this escrow shall file notice of cancellation in Escrow Holder's office, in writing. Within a reasonable time, Escrow Holder shall mail, by certified and regular mail, one copy of the notice to each of the other parties at the addresses stated in this escrow. Unless a written objection to cancellation is filed in Escrow Holder's office by a party within ten (10) days after date of mailing, Escrow Holder is authorized at its option to comply with the notice and demand payment of Escrow Holder's cancellation charges as provided in these General Provision. If a written objection is filed, Escrow holder is authorized at Escrow Holder's option to hold all the money and documents contained in this escrow and take no further action until otherwise directed, either by the parties' mutual written instructions, or final order of a court of competent jurisdiction.

**8.    ACTION IN INTERPLEADER**
The parties hereto expressly agree that Escrow Holder has the absolute right at Escrow Holder's election to file an action in interpleader requiring the parties to answer and litigate their several claims and rights between themselves and Escrow Holder is authorized to deposit all documents and funds held in this escrow with the clerk of the court. In the event such an action is filed, the parties jointly and severally agree to pay Escrow Holder's cancellation charges and costs, expenses and reasonable attorney's fees which Escrow Holder is required to expend or incur in the interpleader action, the amount thereof to be fixed and judgment therefore to be rendered by the court. Upon the filing of the action, Escrow Holder shall thereupon be fully released and discharged from all obligations to further perform any duties or obligations otherwise imposed by the terms of this escrow.

**9.    TERMINATION OF AGENCY OBLIGATIONS**
If there is no action taken on this escrow within six (6) months after the "time limit date" as set forth in the escrow instructions or written extension thereof, Escrow Holder's agency obligation shall terminate at Escrow Holder's option and all documents, monies or other items held by Escrow Holder shall be returned to the parties depositing the same. In the event of termination of this escrow, whether at the request of any of the parties or otherwise, all fees and charges due in connection with this escrow including expenditures incurred and/or authorized shall be paid by the parties hereto.

**10.    CONFLICTING INSTRUCTIONS**
Should Escrow Holder before or after close of escrow receive or become aware of any conflicting demands or claims with respect to this escrow or the rights of any of the parties hereto, or any money or property deposited herein or affected hereby, Escrow Holder shall have the right to discontinue any or all further acts on Escrow Holder's part until the conflict is resolved to Escrow Holder's satisfaction, and Escrow Holder shall have the further right to commence or defend any action or proceedings for the determination of the conflict as provided in the "Right of Cancellation" and "Action in Interpleader" paragraphs of these General Provisions.

Buyer's Initials _____    _____          Seller's Initials _____    _____

**11.    FUNDS RETAINED IN ESCROW**
If funds remain in escrow on the date which is 90 days after the close of this escrow, in the event there are funds 90 days after the estimated closing date set forth in these instructions) then a monthly funds held fee of $25.00 shall accrue for each month or fraction of a month thereafter that the funds, or any portion thereof, remain in escrow. Escrow Holder is authorized to deduct the monthly funds held fee directly from the funds held on a monthly, or other periodic basis (i.e., quarterly, semi-annually, etc). The parties acknowledge and agree to pay these sums to compensate you for your administration, monitoring, accounting, reminders and other notifications and processing of the funds so held in accordance with this funds held fee agreement.

Buyer's Initials_____        Seller's Initials_____

**12.    USURY**
Escrow Holder is not to be concerned with any question of usury in any loans or encumbrances involved in the processing of this escrow and Escrow Holder is hereby released of any responsibility and/or liability therefor.

**13.    INDEMNITY FOR ATTORNEYS FEES AND COSTS**
In the event suit is brought by any party to this escrow, including the Escrow Holder or any other party, against each other, or others, including the Escrow Holder, claiming any right they may have against each other or against the Escrow Holder, then in that event, with the exception of gross negligence by the Escrow Holder, the parties hereto agree to indemnify and hold the Escrow Holder harmless against any attorney's fees and costs incurred by it.

**14.    AMENDMENTS TO ESCROW INSTRUCTIONS**
Any amendment or supplement in these escrow instructions must be in writing. These escrow instructions and any written amendments, supplements or exhibits attached thereto constitute the entire escrow agreement among the Escrow Holder and the parties hereto with respect to the subject matter hereof and supersedes all prior understandings, with respect thereto.

**15.    COMPLIANCE WITH INSTRUCTIONS**
The undersigned Buyers and Sellers, in consideration of the closing of this escrow, hereby agree that should adjustments be required as a result of clerical errors or oversight, Buyers and Sellers will cooperate in every way possible to assist First American Title Company in accomplishing those adjustments, whether it be prior to or following recording of the documents.

**16.    INSURANCE POLICIES OTHER THAN TITLE INSURANCE**
When dealing with real property and/or improvements located thereon it is advisable to obtain fire, hazard or liability insurance coverage. In all acts in this escrow relating to insurance, including adjustments, if any, Escrow Holder may assume that each policy is in force and that the necessary premium has been paid. Escrow Holder shall not be responsible for obtaining fire, hazard or liability insurance, unless Escrow Holder has received written instruction prior to close of escrow from the parties or their respective lenders.

**17.    FACSIMILE INSTRUCTIONS**
In the event the parties utilize "facsimile" transmitted signed documents, Buyer and Seller hereby agree to accept and instruct the Escrow Holder to rely upon such documents as if they had original signatures. Buyer and Seller acknowledge and agree to provide to Escrow Holder, within seventy-two (72) hours of transmission, such documents bearing the original signatures. Buyer and Seller further acknowledge and agree that documents necessary for recording with other than original signatures (i.e., facsimiles) will not be accepted for recording by the County Recorder thereby delaying the close of escrow.

**18.    EXECUTE IN COUNTERPART**
These escrow instructions and any subsequent amendments may be executed in one or more counterparts, each of which independently shall have the same effect as if it were the original, and all of which taken together shall constitute one and the same instruction.

**19.    SUPPLEMENTAL TAXES**
If all improvements to said land are not reflected on the most recent tax bill, the parties hereto are aware that a supplemental tax bill may be issued after the close of escrow based upon the value of said improvements or improvements in progress. Escrow Holder shall prorate taxes based on the latest available tax bill and shall not be held responsible for the proration or payment of any supplemental tax bill issued or made available after the closing of this escrow. Should a bill for supplemental taxes be received following the close of escrow, buyer will be totally responsible for payment of same.

**20.    SELLER'S PROPERTY DISCLOSURE**
Chapter 113 of NRS require that a Seller's Property Disclosure Form or Waiver Form be delivered by the seller to the purchaser at least ten (10) days before residental property is conveyed. NRS also requires that seller provide buyer with homeowners association by-laws, minutes, and financial statements prior to closing (if applicable). Both buyer and seller agree that this will be handled outside of escrow and acknowledge that Escrow Holder is not to be concerned with these documents.

**21.    WOODSTOVE/INSERT DISCLAIMER**
Buyer and Seller herein are advised that regulations issued by the Washoe County Health Department regarding the existence or non-existence of a solid fuel burning device on the land herein described will prevent the title company from closing any real estate transaction without first having in its possession a "Compliance Certificate" or a "Notice of Exemption" signed by the buyer and seller, and bearing a Health Department approval stamp. Escrow Holder is authorized to advance funds from monies deposited in escrow to cover the cost of the Health Department Certification, if applicable for subject property.  (Affects Washoe County properties only.)

Buyer's Initials  _____   _____        Seller's Initials  _____   _____

IF THE TRANSACTION WHICH IS THE SUBJECT OF THIS ESCROW IS A SALE, THE PARTIES TO THIS TRANSACTION MAY HAVE CERTAIN TAX REPORTING AND WITHHOLDING OBLIGATIONS AS MORE FULLY DESCRIBED IN FEDERAL/STATE LAW BY GENERAL PROVISION 22-24 BELOW.

**22.    REPORTING TO THE INTERNAL REVENUE SERVICE**
The Tax Reform Act of 1986 provides that Escrow Holder must report certain information regarding certain real estate transactions to the Internal Revenue Service. This information includes, among other things, the Seller's social security number and/or tax identification number and forwarding address, and the gross sales price of the transaction. This is not a requirement generated by Escrow Holder, but rather a means of complying with the tax law. This information must be provided to First American Title Company of Nevada upon the opening of escrow and neither can escrow be closed, nor can a deed or any other documents be recorded until the information is provided and the Seller certifies the accuracy of the information in writing. By execution of these escrow instructions, parties acknowledge receipt of this notice.

**23.    TAX REPORTING AND WITHHOLDING OBLIGATIONS OF THE PARTIES**

**FEDERAL LAW:** Internal Revenue Code Section 1445 places special requirements for tax reporting and withholding on the parties to a real estate transaction where the Seller (Transferor) is a non-resident alien, a non-domestic corporation or partnership, a domestic corporation or partnership controlled by non-residents or non-resident corporations or partnership.

**LAWS OF STATES OTHER THAN NEVADA:** If the parties are required to withhold by the law of a state other than Nevada, the parties understand that the withholding obligation is the exclusive obligation of the parties to this transaction and that Escrow Holder is not obligated to withhold or notify the parties of any withholding obligation they may have.

With respect to federal law and the laws of states other than Nevada referred to above, the parties to this transaction should seek an attorney's, accountant's, or other tax specialist's opinion concerning the effect of these laws on this transaction. The parties to this transaction should NOT act on or rely on any statements made or omitted by the escrow officer, title officer, or other closing officer with respect to tax reporting or withholding requirements. By execution of these escrow instructions, the parties acknowledge receipt of this notice.

**24.    DISCLOSURE OF TAXPAYER IDENTIFICATION NUMBER**
Internal Revenue Code Section 6109(h) imposes requirements for furnishing, disclosing, and including taxpayer identification numbers in tax returns on the parties to a residential real estate transaction involving seller-provided financing. The parties understand that the disclosure reporting requirements are exclusive obligations between the parties to this transaction and that Escrow Holder is not obligated to transmit the taxpayer identification numbers to the Internal Revenue Service or to the parties. Escrow Holder is not rendering an opinion concerning the effect of this law on this transaction, and the parties are not acting on any statements made or omitted by the escrow or closing officer. By execution of these escrow instructions, the parties acknowledge receipt of this note.

To facilitate compliance with this law, the parties to this escrow hereby authorize Escrow Holder to release any party's taxpayer identification numbers to any requesting party who is a party to this transaction. The requesting party shall deliver a written request to escrow. The parties hereto waive all rights of confidentiality regarding their respective taxpayer identification numbers and agree to hold Escrow Holder harmless against any fees, costs, or judgments incurred and/or awarded in connection with the release of tax payer identification numbers.

**THE GENERAL PROVISIONS PRINTED ABOVE HAVE BEEN READ AND ARE HEREBY APPROVED BY THE UNDERSIGNED.**


_____         _____
Perry S. Klein                          Timothy Carey


_____         _____
Rita S. Perry                           Virginia Carey


Buyer's Initials _____  _____      Seller's Initials _____  _____

**Exhibit O**

1  DAVID J. WINTERTON, ESQ.
   Nevada Bar No. 004142
2  DAVID E. DOXEY, ESQ.
   Nevada Bar No. 008429
3  DAVID J. WINTERTON & ASSOC., LTD.
   211 N. Buffalo Drive, Suite A
4  Las Vegas, Nevada 89145
   (702) 363-0317
5
   Attorney for Perry Klein
6

*FILED*

Mar 31   4 20 PM '04

*Shirley B. Parraguirre*
CLERK

7
8                    DISTRICT COURT
                 CLARK COUNTY, NEVADA
9

10  PERRY KLEIN, an individual,          Case No. A478057

11          Plaintiff,                    Dept. No. XIII

12  vs.

13  ALAN RAPOPORT, an individual and
    and DOES 1 through X, inclusive, and
14  ROE CORPORATIONS I through X,        **Date: March 22, 2004**
    inclusive,                           **Time: 9:00 a.m.**
15
            Defendants
16

17  **ORDER RE: MOTION TO REMOVE LIS PENDENS**
    **OR MOTION TO SELL REAL PROPERTY ON SHORTEN TIME.**

18       COMES NOW, PERRY KLEIN, Plaintiff by and through his counsel David J. Winterton,

19  Esq, of the law firm of David J. Winterton & Associates Ltd., hereby filed a Motion to Remove

20  Lis Pendens or in the alternative Motion to Sell Real Property on Shorten Time. ALAN

21  RAPOPORT, Defendant, by and though his counsel David Winter Esq. attended the hearing and

22  opposed the Motion. The Court having considered the pleading and papers on file and oral

23  argument presented by counsel, enters the following order:

24       IT IS HEREBY ORDERED that the Motion to Remove the Lis Pendens is hereby

25  GRANTED.

26       IT IS FURTHER ORDERED that the lis pendens recorded in Book 20040203 Instrument

27  00542 filed on February 6, 2004 on a certain piece of property in the above captioned case known

28  as 6 Via Del Garda, Henderson APN NUMBER 160-23-515-012 ("Property") is hereby released

                                    1

1    and canceled on the Property described herein.

2        Dated this 3& day of March, 2004

3

4                                    GARY R. DENTON

5                              _____
                              DISTRICT COURT JUDGE

6

7    Submitted by:

8    DAVID J. WINTERTON & ASSOCIATES

9    By: _____
10        David J. Winterton Esq.
          Nevada Bar No.: 004142
11        211 North Buffalo Drives, Suite A
          Las Vegas, Nevada 89145
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    2

**Exhibit P**

1  I had to bring the police in the house because
2  they wanted me to point out who all the people
3  were involved in this situation, and I had to
4  point out that my husband was sitting there with
5  Shelley; that Mr. Rapoport had left the scene. I
6  had to speak about what had occurred with that
7  incident.
8      Q     After the police left anything else?
9      A     No, I don't think anything else happened
10 after the police left.
11     Q     So you don't recall anything else taking
12 place on the 4th regarding --
13     A     Is that the night when Alan was naked?
14     Q     Yeah, I guess it is.
15     A     Well, no, actually it's not. It's not.
16 That was the next day.
17     Q     On the 5th?
18     A     The next day. Well, I will never forget
19 this as long as I will live, but I was in the
20 kitchen that morning, and Mr. Rapoport was
21 receiving a fax. The fax machine was in the
22 kitchen, and I went over to the fax machine not
23 knowing what was coming through. I know that it
24 was something from Mr. Winter, and -- the master
25 bedroom is on the upstairs and you have direct

1      A     Then Shelley came out of the master
2  bedroom and stood above and asked was my husband
3  naked?
4      Q     Anything else?
5      A     That was it.
6      Q     Then what happened? When's the next
7  incident that took place?
8      A     The next incident is the TPO.
9      Q     Tell us what happened on
10 February 6th that evening.
11     A     I remember getting a knock on the door
12 about 5:30, and my husband -- on our bedroom door
13 and my husband opened the door, and it was Scott
14 Sibley -- who we find out is Scott Sibley serving
15 us TPOs.
16     Q     So what did you do after -- did you
17 actually get served?
18     A     I didn't receive them. He handed them
19 to my husband.
20     Q     So after it was served to your husband,
21 what did you do?
22     A     We were like in disbelief. I believe we
23 called Dave Kallas wanting somebody to step us
24 through something that we were not familiar with.
25 And we listened to what Dave said about explaining

1  view as you walk out of the master bedroom into
2  the kitchen. He saw me looking at the fax and
3  told me that I need to mind my own business and
4  proceeded to come downstairs completely naked and
5  told me that I should leave the home.
6      Q     So what did you do?
7      A     I was extremely embarrassed. I
8  immediately called my husband and he called Mark
9  Andrus to get me some protection.
10     Q     So what happened?
11     A     Mark Andrus came to the house and saw
12 Alan Rapoport naked.
13     Q     Then what happened? Did Alan leave or
14 what?
15     A     No. Alan wrapped a towel around him.
16 We I remember all sat in the living room. Alan
17 called his attorney, and Mark -- and put his
18 attorney on the phone with Mark Andrus, and
19 basically his attorney told Mark Andrus that he
20 had no right being in the house.
21         MR. WINTER:  Objection.
22         THE COURT:  Sustained.
23 BY MR. WINTERTON:
24     Q     What happened next after the -- you
25 can't talk about the phone call. It's hearsay.

1  about the TPO, and we just sat in our room and
2  waited for Dave Kallas to come to the house.
3      Q     Did you pack up anything at that time or
4  just wait?
5      A     I didn't. We were just waiting because
6  we didn't know what to do.
7      Q     Then after Mr. Kallas came, what
8  happened next?
9      A     After Mr. Kallas came I know that we
10 were waiting around for a while. I know that the
11 police ended up coming. I remember that we were
12 talking to the police. We were making sure that
13 the TPOs that were served upon us were valid.
14     Q     And then do you know why there was a
15 concern in regards to the TPO if it was valid or
16 not?
17     A     I don't remember.
18     Q     What happened next after there was this
19 conversation whether or not it was valid? Did you
20 start packing up?
21     A     Dave Kallas said you have to go, so we
22 gathered clothing, toiletries and left.
23     Q     Did you straighten a few things up or
24 did you just basically gather?
25     A     You know, we just made sure -- actually

**Exhibit Q**

1  restraining order.
2      Q    Now, we heard previous testimony that
Henderson is closed on Friday, but you had all day
Thursday to try to go back to Henderson for
5  another TPO; isn't that correct?
6      A    Thursday is an open day.
7      Q    And isn't it also true that there were
8  no other incidents since the Court denied the TPO
9  there were no other incidents of violence at all?
10     A    No, sir.
11     Q    But based upon a previous ruling and a
12 previous situation, you still went ahead to try
13 and get a TPO?
14     A    Yes, sir.
15     Q    Let's go ahead and turn to Exhibit
16 No. 114. Isn't it true on Friday that you went
17 ahead and attempted to get a TPO against Perry
18 Klein and Rita Klein here in Las Vegas?
19     A    Yes.
20     Q    Is there anything different in this
21 report that was different in the other report that
22 you filed?
23     A    Not much.
24     Q    What is different?
25     A    It's a little bit shorter condensed

1  that place?
2      A    I've been there several times.
3      Q    Several times. How do you get there?
4      A    You take —
5      Q    Never mind. I'll move on. I don't want
6  to waste our time going over that. Let's go on to
7  the next one, Maryland Parkway. How often do you
8  go to Maryland Parkway?
9      A    I've probably been to Maryland Parkway
10 50 times.
11     Q    Do you have an office there?
12     A    We worked on the building being
13 demolished. We worked on what to do with it. We
14 had several different thought processes, and we
15 eventually decided just to sell it.
16     Q    Did you have an office there?
17     A    There was a back little office that was
18 unused by the rental car people, and I used the
19 desk and the phone when I was there.
20     Q    So you know Carl Louden very well?
21     A    If Carl's the elder gentleman who was
22 working there most of the time, I've seen him
23 quite a few times.
24     Q    So he would recognize you?
25     A    I hope so.

103

                          80

1  version.
2      Q    Any other differences?
3      A    No, sir.
4      Q    Let's go over to the third page and
5  let's highlight starting at the top of the page
6  down to the signature page. Is that your
7  signature?
8      A    Yes, it is.
9      Q    Now, you had mentioned other places
10 frequented regularly by me as follows, and you've
11 got Pallister Bay?
12     A    Yes.
13     Q    Isn't it true that Pallister Bay you had
14 a tenant renting there?
15     A    There was a tenant. I don't know if the
16 tenant was there then.
17     Q    Was there anyone living there at that
18 time?
19     A    No. I think at that time I was redoing
20 the backyard to get what they call Arizona
21 landscaping and you get a credit from the city.
22     Q    So you hired someone to do the
23 landscaping; isn't that correct?
24     A    That's true.
25     Q    Isn't it true that you did not frequent

                          82

1      Q    We'll move on. Now, let's go over to
2  Exhibit No. 115. This is Rita Klein's temporary
3  protective order?
4      A    Yes.
5      Q    What acts of violence did Rita do in
6  this application?
7      A    Same as the prior one.
8      Q    What is that?
9      A    Disconnected the phone system in the
10 house, threatening language, belligerent,
11 aggressive.
12     Q    Where does it talk about disconnecting
13 the phone system?
14     A    On 2/2 I went to the home and was
15 upstairs in my room on the telephone. Defendant
16 or defendant's wife entered my house, disconnected
17 the phone system.
18     Q    That's the police report. So you're
19 saying that's the police report that's attached to
20 the back?
21     A    It's the first page of 115 that you
22 asked me to turn to.
23     Q    You've got defendant was invited guest
24 into my home. On 2/2 I went to my home upstairs
25 in my room, was on the phone. Wife entered my

**Exhibit R**

1 photo shoots. This is Las Vegas Life Home and
2 Design. You can see the photo of the home back
3 here that they use in their sales brochure. We've
4 had some -- we've been very lucky. Had an article
5 in the New York Times about the garages. It's
6 been very good. I've been very pleased.
7      Q    Just one last thing and I'm wrapping up.
8 Did you deal with a lot of clients from California
9 that like to move to Vegas?
10      A    We have a lot of Californians.
11      Q    And have you had some wealthy ones that
12 like to keep a home here and claim residency here
13 and still live in California?
14      A    Several.
15      Q    Are you familiar as a realtor with any
16 tax advantages doing that?
17      A    They do it in order not to pay
18 California income tax. I know that much.
19      Q    And do you have any clients that have
20 done that that it's actually paid for the mortgage
21 or almost paid for the mortgage by saving those
22 taxes?
23      A    I've had them tell me it's almost paid
24 for the house, yeah.
25      MR. WINTERTON:    No further questions for

1      THE COURT:    We have another witness that
2 should be very short that needs to get on and off
3 today, and I don't know if you're going to get
4 finished today anyway to my chagrin and your
5 chagrin. I realize it's a difficult proposition.
6 If you would please just stand down and take a
7 seat outside.
8           Mr. Winterton, you can go ahead and call
9 your other witness and see if we can get him on
10 and off.
11      MR. WINTERTON:    He's coming in right
12 now.
13 Whereupon,
14           CARL LOUDEN,
15 was administered the following oath by the court
16 clerk.
17      THE CLERK:    You do solemnly swear that
18 the testimony you give in this action shall be the
19 truth, the whole truth, and nothing but the truth
20 so help you God.
21      THE WITNESS:    Yes.
22      THE CLERK:    State your name and spell
23 your first and last name for the record.
24      THE WITNESS:    My name is Carl Louden,
25 L-O-U-D-E-N.

164

1 this witness.
2      THE COURT:    Mr. Winter, do you have any
3 questions?
4      MR. WINTER:    Sure.
5      THE COURT:    Did you have a chance to
6 look in terms of the tape recording?
7      MR. WINTER:    I don't have that CD with
8 me in the courtroom today.
9      THE COURT:    Do you have a copy of the CD
10 that was produced, Mr. Winterton?
11      MR. WINTERTON:    The copy that we turned
12 over to him is not with me, your Honor. What
13 we've done is we've broken it up into individuals.
14 I can get you a copy that we produced.
15      MR. WINTER:    I can check on that too
16 this evening. I do have them. I just don't have
17 them with me.
18      THE COURT:    I was hoping not to have
19 Mr. Northup come back if at all possible and we
20 probably don't need to anyway. All right,
21 Mr. Winter.
22      MR. WINTERTON:    If Mr. Winter and I can
23 also approach, I just have one last issue I'd like
24 to address with you.
25      (off-the-record bench conference.)

166

1           DIRECT EXAMINATION
2 BY MR. WINTERTON:
3      Q    Mr. Louden, my name is David Winterton.
4 We've never met.
5      A    Hi.
6      Q    I understand you had an office at
7 Maryland Parkway for a number of years?
8      A    That's true.
9      Q    And there was a building behind that.
10 Was that building occupied, or was it closed or
11 locked up?
12      A    There's a little bit of story to it. Do
13 you want to know?
14      Q    Briefly, yes.
15      A    I rented that property -- the property
16 that I had, the building that I had which is a
17 small satellite building from the main building, I
18 rented that in 1986, and about 1992 some kind of a
19 business transaction came about and a man -- I
20 rented it from a man named Leonard Saye. In '92,
21 give or take, a man named David Feradino,
22 Interstate Realty whatever, a business transaction
23 came about and he then had ownership of the
24 property and I was then renting from him, and at
25 that time he had a crew come in and they

167

1  completely opened up that building up, no drywall,
2  no electrical, no lights. The only thing that was
3  there was like a new building when you're walking
4  through the two-by-four's, the studding that was
5  up. Since 1992 that's the way that building has
6  been.
7      Q    So it couldn't even be occupied?
8      A    Homeless. They did.
9           THE COURT:  What address are we speaking
10 of?
11          THE WITNESS:  2750 South Maryland
12 Parkway.
13 BY MR. WINTERTON:
14     Q    Now, you had an office there?
15     A    I had a satellite. That originally was
16 a doctor's office with a satellite pharmacy.
17 First drive-thru pharmacy in Vegas in the '50's.
18 I rented that particular section, and I did my
19 business of the truck rental from that location.
20     Q    Did you share that office with Alan
21 Rapoport?
22     A    I don't know Alan Rapoport.
23     Q    This gentleman here, do you recognize
24 him at all?
25     A    Which one? I'm sorry I do not.

168

1          MR. WINTERTON:  No further questions,
2  your Honor.
3          THE COURT:  Mr. Winter, any questions?
4
5               CROSS-EXAMINATION
6  BY MR. WINTER:
7      Q    Could you tell me a little bit more
8  about the office space that you say was at 2750
9  Maryland Parkway? Is it entirely open or desks in
10 it, walls? What exactly?
11     A    The one I had or the other one?
12     Q    So there's two offices in there?
13     A    There was a main building about three or
14 4,000 square feet, and I had a small building
15 which was the original pharmacy 600 square feet.
16     Q    So did there come a time that you know
17 that the property was sold from Feradino?
18     A    David Feradino he had it. I don't know
19 if I recall exactly the sequence. The thing that
20 I can tell you is that during the period that I
21 was there from 1986 to 2005 I had five different
22 landlords, I was on a month-to-month basis and one
23 of them for a short period of time was the IRS so
24 that's my -- no one believes that I was a
25 month-to-month for that long, but I was.

169

1      Q    Now, I guess then what I'm trying to
2  understand, so there's more than one building back
3  there; is that correct?
4      A    I'm sorry?
5      Q    There's more than one building back
6  there?
7      A    There's two buildings, yeah. One large
8  building and one closer to the street that was
9  detached.
10     Q    And you were just in the detached 600
11 square foot one?
12     A    Exactly.
13     Q    I think that's what you said was the one
14 with the pharmacy that had the drive-up; is that
15 right?
16     A    That's it.
17     Q    And did you hear anything about a 9.99
18 shoe store owning that building?
19     A    A group that I'm not sure where they
20 were based, either Salt Lake but they had an
21 office in the LA area also, they purchased that
22 property 2000, give or take. They purchased it,
23 then they immediately sold it to another company
24 that's now in Laguna Niguel. Those are the people
25 that totally.

170

1      Q    Did you meet any of the owners at that
2  time that owned the building?
3      A    I met all of them on a onetime periodic
4  visit.
5      Q    And you have no recollection of
6  Mr. Rapoport being one of those people that you --
7      A    I wouldn't even be able to identify --
8  the only one I can identify at this point in time
9  was probably David Feradino. The rest of them
10 that were people coming in and I would attempt
11 either at that time or afterwards to find out if I
12 could continue on a month-to-month basis.
13     Q    Was there anybody else who was there on
14 a regular basis besides yourself?
15     A    You mean an employee like?
16     Q    Yeah.
17     A    I had an employee that was there on
18 weekends.
19     Q    And was he a younger gentleman than
20 yourself?
21     A    No, he's not.
22     Q    I didn't know.
23          THE COURT:  Careful, Counsel.
24          THE WITNESS:  It was a business by a
25 couple of old men.

103

171

1 BY MR. WINTER:
2     Q   I guess though as you again say sitting
3 here today you can't remember all the various
4 different owners that you've come -- that have
5 come in through the property that you've met?
6     A   I know briefly about them, but it was --
7 for me, the only thing I was interested in was do
8 I still have a place to do business and where do I
9 send the check, and so I did not become involved
10 for a lunch or for any kind of a get-together
11 where I'd sit down and say I'm Carl and go from
12 there. It just never happened.
13     Q   So the other building, was the other
14 building occupied or ever used?
15     A   After 1992, no, and prior to that a
16 number of years also, no.
17     Q   And was there any offices in the rear of
18 your building in the truck rental location?
19     A   No. It was just one building that had a
20 separation in it and beyond that separation is
21 where I kept my equipment.
22     Q   Again, I guess as we are here today at
23 the moment you don't recognize Alan Rapoport who
24 claims he was part of that company that at one
25 time owned that building?

172

1     A   No, I do not. I'm not saying that, no,
2 I didn't see him. I just don't recognize this
3 gentleman. I have no idea. He could have been
4 one of four or five people that came through on
5 any given time when it was changing hands. I
6 can't even identify any one of them because I had
7 no interest in, you know, it was just nothing
8 would make me remember any of them.
9     MR. WINTER: I think that will be fine.
10 I have no other questions for the witness.
11     THE COURT: Mr. Winterton, anything
12 further?
13
14     REDIRECT EXAMINATION
15 BY MR. WINTERTON:
16     Q   If somebody came to your office, oh,
17 approximately 50 times, used your phone and worked
18 out of your office, would you remember him?
19     A   Fifty times?
20     Q   Yeah.
21     A   You betcha.
22     MR. WINTERTON: No further questions,
23 your Honor.
24     THE COURT: All right. Mr. Louden,
25 thank you, sir, I appreciate your time. You can

173

1 step down now.
2     Let's recall Mr. Northup.
3     Mr. Northup I'll still remind you you're
4 still under oath.
5     THE WITNESS: Yes, sir.
6     THE COURT: Thank you.
7     MR. WINTERTON: Thanks to the Court for
8 the indulge.
9     THE COURT: Certainly.
10
11     CROSS-EXAMINATION
12 BY MR. WINTER:
13     Q   First thing I wanted to ask you about
14 that has come up as an issue in this case is
15 Mr. Rapoport's intent to sell the house. Do you
16 have any information or anything that would lead
17 you to believe that Mr. Rapoport never intended or
18 wanted this house sold?
19     A   Mr. Rapoport has been very helpful
20 anytime I've wanted to show the property at great
21 inconvenience. Whether he'd had guests there,
22 he's always allowed me to show the home.
23     Q   So the best of your knowledge, he still
24 wants the home sold?
25     A   Yes, absolutely. I was surprised at the

174

1 price increase, but you can easily understand that
2 when there's additional costs in the carry and
3 time on market.
4     Q   You mentioned had Mr. Rapoport discussed
5 with you a lot about setting the price; is that
6 right?
7     A   Yes.
8     Q   And when he's talked to you about
9 raising the price, did you have a long discussion
10 with him, or was it just a short quickie?
11     A   Probably 40 minutes or better.
12     Q   And I believe you testified that you
13 advised him that it might take longer to then
14 market the house?
15     A   Yes, sir.
16     Q   Did he discuss with you at all as to the
17 reason why he wanted to increase the price?
18     A   He walked about the market. Market had
19 improved in Lake Las Vegas and he'd had another
20 year to carry.
21     Q   And did he ever tell you what the carry
22 was on the house?
23     A   I've heard 20,000, I've heard 25 and
24 I've heard 30,000, but a home of that size it
25 could easily 30,000 per month.

**Exhibit S**

**123**

1    Q    What did the place look like?
2    A    Pretty rough, old tired building.
3    Q    Let move on.  When was the next time
4  that you had any involvement that may cover a
5  dispute between these parties?
6    A    January 13th '04 I had to drive to
7  Liberty Lock & Key on West Sahara to pick up a
8  driver's license and credit card of Alan
9  Rapaport's to send it to him at his California
10  address.
11    Q    Do you know what that had to do -- do
12  you know what Alan wanted you to do it or why?
13    A    The only thing I know is when I got
14  there the woman at Liberty Lock & Key said they
15  had tried to rekey the property and that there
16  were dogs in the house and they wouldn't go in the
17  home.
18    Q    Anything else after January that you
19  learned?
20    A    Well, I mean, there's a lot going on
21  here.  February 5, '04 Alan called me and told me
22  Perry had served him with a lawsuit -- sorry.
23  Alan called me and told me that Perry was served
24  with a lawsuit and filed two lis pendens on his
25  lots.

**124**

1    Q    Okay.  Does a lis pendens affect a
2  realtor in trying to sell a home?
3    A    Yeah.  It takes a court order to clear
4  the lis pendens in order to sell it.  You can't
5  sell it.  It's locked up.
6    Q    On in February you learned about a lis
7  pendens?
8    A    Yeah.  I could tell things were
9  escalating.
10    Q    Did you talk to Alan about the lis
11  pendens?
12    A    No.  These conversations I just
13  listened.  When you have two -- a divorcing
14  couple, and I'm sorry to relate it to that but
15  that's what I'm used to dealing with, if you side
16  with anyone then the other one fires you.  So if
17  you're going to keep -- if you're going to keep
18  the transaction and -- you listen, you don't take
19  sides and you do the very best job you can.
20    THE COURT:  Job security.
21    THE WITNESS:  Yes, sir.
22  BY MR. WINTERTON:
23    Q    So you're trying to balance this and
24  things have escalated.  Did you know anything
25  about him trying to get a temporary protective

**125**

1  order?
2    A    He had told me on 2/5 that his attorney
3  wanted a restraining order against Perry.
4    Q    Did he tell you that there was some
5  violence regarding a truck or an accident?
6    A    No.
7    Q    Did he tell you anything about some
8  violence and threats and a cue ball or anything
9  that night?
10    A    No.
11    Q    He told you on 2/5 he was trying to get
12  a restraining order.  What else did he tell you
13  about that?
14    A    Nothing that I remember.
15    Q    When was the next time that you heard
16  about this?
17    A    On 2/9/04.
18    Q    What happened on 2/9/04?
19    A    Alan asked me to come by the houses to
20  talk about a price reduction to 3.5 million.  He
21  wants the home sold and gone.  It's an
22  uncomfortable situation that's occurring here.  He
23  then asked if he funneled $3 million to me could I
24  buy the house and take Perry and Rita out of the
25  picture without giving them much money.

**126**

1    Q    I get the feeling this has been a little
2  emotional for you.
3    A    A lot of stress.  A lot of stress being
4  here.  Alan Rapoport has been very good to me.
5    Q    After that so he basically wanted to see
6  if he could do a sale to a straw buyer and then he
7  would get the house back but sell it for a lesser
8  amount?
9    A    He did not say straw buyer.  He said me.
10    Q    Sell it to you for 3 million?
11    A    He said if he funneled 3 million to me
12  could I buy the house, take Perry and Rita out of
13  the picture without giving them much money.
14    Q    Anything else that day that you recall?
15    A    He showed me a CD of Perry and Rita
16  Klein that had $50,000 in it.
17    Q    Anything else your notes show that you
18  have?  Okay.
19    When was the next time that you heard
20  about this?
21    A    2/11/04.  Alan asked me to videotape the
22  Kleins.  Evidently there was some type of court
23  order where they were to come into the house and
24  collect a few things.  Rita was very upset when
25  she came in.  Her car had been broken into, and

127

1  they were looking for paperwork they couldn't
2  find. I asked Alan on the phone about it, and he
3  said too bad for them, they were supposed to get a
4  few things and get out.
5      Q    So did you videotape them?
6      A    Yes.
7      Q    What did you do with the videotape?
8      A    Gave it to Alan.
9      Q    When you were there, did the Kleins say
10 anything to you, or was it just Rita, or was it
11 Rita and Perry?
12     A    It was Rita and Perry. Nothing that I
13 remember other than they were very upset about
14 their car and the missing paperwork. I assumed it
15 was the CD, the paper that Alan had showed me the
16 day before, but I don't know.
17     Q    Now, I take it in this litigation there
18 was a party that night?
19     A    Yes.
20     Q    And did you go to the party?
21     A    Yes, I did.
22     Q    And did you visit with Alan at the
23 party?
24     A    Yes, I did.
25     Q    What do you recall in regards to your

128

1  visit with Alan at the party?
2      A    Shelley met us at the door with Rocco,
3  and we walked up to Alan. He was standing by the
4  elevator.
5      Q    Rocco is their dog?
6      A    Yes, miniature Pomeranian.
7      Q    And you went to Alan by the elevator.
8  What did Alan say?
9      A    Alan said the good guy deal is off; that
10 he had spoken to the judge today. And I said,
11 You've spoken to the judge today, and he said,
12 Yes, I have his direct numbers and the deal's off.
13 I said, The judge also has people here. He said,
14 I don't know who they are but they're here.
15     Q    What else did he say?
16     A    At that time that was about it. He had
17 a lot of people pulling him.
18     Q    Did you ever know -- were there certain
19 people at the party that you know, or was it
20 mainly strangers?
21     A    My wife and I recognized the gentleman
22 that had done the low voltage work on the house.
23 I don't remember his name at the house.
24     Q    Byron, Brian?
25     A    I chatted with him.

129

1      Q    Is there anyone by the name of Jason
2  Huffer? Was Jason Huffer at the party?
3      A    Yes, I met Jason Huffer that night.
4      Q    What did you talk about with Jason
5  Huffer?
6      A    It was real brief. He was introduced as
7  Judge Tony Abbatangelo's campaign manager.
8      Q    Anything else?
9      A    No, just a brief introduction.
10     Q    Did you meet Scott Sibley there?
11     A    No.
12     Q    Do you know who Scott Sibley is?
13     A    Yes, I do.
14     Q    So the gentleman there?
15     A    Yes.
16     Q    Was Tony Abbatangelo there?
17     A    Yes, he was.
18     Q    And what did you notice in regards to
19 Tony Abbatangelo?
20     A    He arrived at 8:40. He walked in the
21 room, went right over to Alan Rapoport and hugged
22 him. Then the judge went around the room. He
23 knew several people in the room and talked with
24 several people in the room.
25     Q    When he was walking around, did he know

130

1  those people or not or you don't know?
2      A    No, he knew them. It was obvious --
3  there were three or four people in the room he was
4  very familiar with.
5      Q    Was Ashley Rapoport at the house?
6      A    Yes, she was.
7      Q    And what did Ashley Rapoport --
8      A    She signed a contract for me that night
9  on the sale of Pallister Bay.
10     Q    Would you explain to me what happened?
11 You were at the party.
12     A    Ashley was going to be there. I had the
13 contract on Pallister Bay. Ashley and I went into
14 the office, and she signed the contract, and I
15 sent back. We all went back and enjoyed the
16 party.
17     Q    So Ashley was selling Pallister Bay?
18     A    Yes, sir.
19     Q    And you had a buyer?
20     A    Yes, sir.
21     Q    Who was the buyer?
22     A    Eric Buck, the tenant that was living in
23 the property.
24     Q    Did that deal go through?
25     A    No. It fell apart due to financing.

| In re:<br><br>SHALAN ENTERPRISES, LLC, substantially consolidated  with ALAN RAPOPORT<br><br>                                                                  Debtor(s). | CHAPTER 11<br><br>Case No.: 2:09-bk-43263-PC<br>Case No.: 2:09-bk-43499-PC |
|---|---|

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

506 Santa Monica Blvd. Suite 200, Santa Monica, CA 90401

A true and correct copy of the foregoing document described **REPLY MEMORANDUM IN SUPPORT OF MOTION TO ESTIMATE KLEINS' CLAIM FOR VOTING PURPOSES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On __12/2/10__  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On __12/2/10__  I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 12/2/10 | Brian Link | */s/ Brian Link* |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                    **F 9013-3.1**

| In re:<br>SHALAN ENTERPRISES, LLC, substantially consolidated  with ALAN<br>RAPOPORT<br><br>                                                                    Debtor(s). | CHAPTER 11<br><br>Case No.: 2:09-bk-43263-PC<br>Case No.: 2:09-bk-43499-PC |
|---|---|

**BY NEF:**

    Robert D Bass     rbass@greenbass.com
    Russell Clementson     russell.clementson@usdoj.gov
    Leslie A Cohen     leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com
    Caroline Djang     crd@jmbm.com
    Joseph A Eisenberg     jae@jmbm.com
    Thomas M Geher     tmg@jmbm.com
    Jeffrey J Hagen     hagenlaw@earthlink.net
    Sheri Kanesaka     sheri.kanesaka@bryancave.com
    Charles Liu     cliu@mrllp.com
    United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
    David J Williams     dwilliams@mrllp.com

**BY MAIL:**

Hon. Peter Carroll
U.S. Bankruptcy Court
255 E. Temple Street
Los Angeles, CA 90012

Russell Clementson
725 S Figueroa Ste 2600
Los Angeles, CA 90017

Joseph A Eisenberg
Caroline Djang
Jeffer Mangels Butler & Marmaro LLP
1900 Ave Of The Stars, 7th Flr
Los Angeles, CA 90067

Robert D Bass
Greenberg & Bass LLP
16000 Ventura Blvd Ste 1000
Encino, CA 91436

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                    **F 9013-3.1**